**Jocelyn WHIDBEE and Shirlene Tranquille, Plaintiffs,**

v.

**McDONALD'S CORP., Route 211, Middletown, New York, Ed and John Gozarelli, Owners, Defendants.**

**No. 98 CIV. 7484(CM).**

United States District Court,
S.D. New York.

Nov. 12, 1999.

Stephen Bergstein, Law Offices of Michael Sussman, Goshen, NY, for Plaintiffs.

Joel L. Finger, Michael P. Pappas, Roberts & Finger, LLP, New York City, for Defendants.

## MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiffs Jocelyn Whidbee and Shirlene Tranquille, both of whom are African–American, brought claims against their former employer, McDonald's Restaurant in Middletown, New York, and its owners, Ed and John Garzarelli, for (1) employment discrimination pursuant to 42 U.S.C. § 1981, seeking both compensatory and punitive damages under that statute, and New York Executive Law §§ 296 and 297 and (2) constructive discharge. The defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, on several grounds discussed below. For the reasons that follow, the motion is granted.

*Background*

Plaintiffs began working at McDonald's in Middletown in late 1997. Defendants John and Ed Garzarelli[1] are owners of Garzarelli Food Specialties, Inc., which owns and operates the McDonald's in Middletown. This lawsuit stems from a series of racially offensive comments allegedly made by a co-worker, Richard Corliss, over the span of approximately three months beginning in April 1998.

Plaintiffs allege that Corliss made racial slurs on the following occasions before they brought Corliss's conduct to the attention of Patrick Grable, the restaurant's general manager: (1) in April 1998, Corliss made unidentified racially offensive comments to Jamie Hunter, a co-worker; (2) in April or May, Corliss told Tranquille while they were having lunch in the break room that blacks and Puerto Ricans are lazy and were "bringing down Middletown," made two derogatory remarks about Mexicans, and made racially disparaging comments in reference to his ex-wife's son; (3) in early June, Corliss told Hunter that "he's a lazy black boy because he don't like to work" and that he had "a rope in the back shed to hang [Hunter's] butt"; and (4) on June 5, Hunter told Tranquille that Corliss and a co-worker identified only as "Charlotte" had called her a "skinny black bitch." Whidbee also testified that Corliss told another McDonald's crew person that Plaintiffs were "black bitches," but was unable to remember the date of this remark, other than that it occurred before July.

According to their depositions, on June 8, 1998, Plaintiffs complained to Grable that Corliss had directed racist statements towards them and other McDonald's employees during the two preceding months.[2] Defendants claim that Grable told them at the June 8 meeting that he would speak to Corliss; Whidbee and Tranquille claim that Grable told Tranquille that she would have to handle the problem herself.

Plaintiffs again complained to Grable on June 9 that Hunter told Whidbee on that same date that Corliss had referred to another African–American employee as a "lazy black snake." It is undisputed that Grable told Plaintiffs during their conversation that he would approach Corliss about the issue. Grable avers that he intended to speak with Corliss that afternoon, but that Corliss had left for the day before Grable had an opportunity to do so. The following day, Corliss had the day off and Grable was in New Jersey for a two-day managers' meeting.

Thus, Grable's earliest opportunity to confront Corliss was June 12. However, on June 10, Plaintiffs gave Grable written notice that they were resigning as of June 23. They told Tina Hanley, another supervisor, that the reason was Grable's failure to address Corliss's conduct, but Whidbee also testified that part of her motivation in quitting was her desire to apply to a McDonald's in Monticello, closer to her new home.

On June 11, while Grable was still away, Plaintiffs complained to Hanley that Corliss had referred to Whidbee as a "black sheep." Hanley reported the incident to Grable when Grable returned the following day, Friday, June 12. That very day, Grable met with Corliss and gave him a verbal warning, advising him that racially offensive remarks at work were unacceptable. Unfortunately, this did not put an end to Corliss's offensive interjections. On June 15, George Doty, a co-worker, reported to Plaintiffs that he heard Corliss state that he "still couldn't stand black folk."

1. The surname of the individual defendants is spelled differently in the caption on the papers submitted to this Court ("Gozarelli") and in the parties' briefs ("Garzarelli"). The Court assumes that the spelling "Garzarelli" given in Defendants' brief is the correct one, and therefore uses that version in this opinion.

2. Tranquille testified that she could not recall exactly what she and Whidbee reported to Grable at this meeting, but that she did tell Grable that Corliss had "said other things to [her] in the past." (Tranquille Dep. at 78.)

Plaintiffs claim that they met with Grable again the following day, June 16, to report Corliss's most recent comment and cited his continued slurs as the reason for their resignations.[3] Plaintiffs taped this meeting without Grable's knowledge, and cite from their conversation Grable's comment that if "talking to Rich doesn't handle it or if you try talking to Rich and that doesn't do anything, then you have to leave." (Transcript of Taped Conversation between Patrick Grable, Jocelyn Whidbee, and Shirlene Tranquille at 9, attached as Exhibit 1 to Affirmation of Stephen Bergstein in Opposition to Motion for Summary Judgment). However, in a later portion of that conversation not cited by Plaintiffs, Grable stated: "[W]e can sit down with him again and then give him a choice. He's either got to stop saying it ["black sheep"] or he's got to quit." (*Id.* at 14.) Grable also told Plaintiffs that he had "to do some research through McDonald's, too, to find out exactly ... which way [he] should handle [Corliss's harassment], if it can't be stopped." (*Id.*) And in an instance where actions speak louder than words, that very day Grable issued Corliss a written warning, stating that any further offensive conduct would result in disciplinary measures, up to and including termination.

Even this step did not deter continued harassment from Corliss, according to Plaintiffs' depositions. Tranquille testified that on or about June 17 or 18, referring to the recently reported dragging of an African–American man to death from a pickup truck in Texas, Corliss, in Tranquille's presence, expressed his desire to buy a truck, presumably in order to carry out the same act himself, and suggested that the victim may have provoked his killers. At approximately the same time, Plaintiffs stated, Corliss commented with respect to the much-publicized controversy involving false rape allegations by Tawana Brawley, an African–American woman, that "black lawyers are just out to get money from white folks." Plaintiffs concede that they never reported these statements to any of their supervisors.

In any event, it is undisputed that on June 26, Whidbee met with Patrick Grable, McDonald's District Supervisor Diane Grable, and Corliss, at which point both Patrick and Diane Grable warned Corliss that he would be terminated if he used racially offensive language again. Tranquille was given a similar opportunity to meet with the Grables and Corliss but declined to do so. Both Plaintiffs left McDonald's employ on June 26. They subsequently brought the present action.[4]

Defendants have moved for summary judgment, arguing that: (1) Plaintiffs cannot maintain a claim under § 1981 because they were at-will employees, and as such, had no contract with Defendants; (2) Plaintiffs are barred from suing under the New York Human Rights Law having already filed pending administrative charges with the New York State Division of Human Rights; (3) Plaintiffs have failed to demonstrate that Corliss's conduct rose to the level of a hostile environment; (4) Plaintiffs have not shown any basis upon which Corliss's conduct may be imputed to Defendants; (5) Plaintiffs have stated insufficient grounds for an award of punitive damages under § 1981; and (6) the facts established by Plaintiffs cannot support a constructive discharge claim.

*Standard for Summary Judgment*

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to

---

3. The precise date of this meeting is unclear from the parties' submissions. According to Plaintiffs' brief, the conversation took place on June 23, while Defendants identify the date as June 16. However, both Whidbee and Tranquille appear to acknowledge June 16 as the correct date in their depositions. (Whidbee Dep. at 143–48, Tranquille Dep. at 99–100.)

4. Grable testified that in August 1998, after Plaintiffs had resigned, Hunter complained that Corliss had called him "Buckwheat" (Grable Dep. at 28–29), for which Grable gave Corliss a one-week suspension. . (Grable Dep. at 58–59.)

judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). For a plaintiff in a discrimination case to survive a motion for summary judgment, he or she must offer "concrete particulars" to substantiate the claim. *See Meiri v. Dacon*, 759 F.2d 989 (2d Cir.1985), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

*Section 1981 Claim*

42 U.S.C. § 1981 provides in pertinent part:

> (a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefits of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . .
>
> (b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.

Defendants first contend that Plaintiffs, as employees at-will, cannot maintain a cause of action under § 1981 because no contract existed between them and Defendants. The issue of whether a claim for discrimination in the making or enforce-ment of contracts may be brought under that statute by at-will employees has been a matter of considerable judicial dispute.

Specifically, the disagreement centers upon whether a contract can be said to exist for § 1981 purposes between at-will employees and their employers. *See, e.g., Bascomb v. Smith Barney, Inc.*, No. 96 Civ. 8747, 1999 WL 20853, at *4 (S.D.N.Y. Jan.15, 1999) (holding that at-will employment is non-contractual and therefore at-will employees cannot state claim under § 1981); *Brown v. Sara Lee Corp.*, No. 98 Civ. 1593, 1998 WL 809518, at *3 (S.D.N.Y. Nov.19, 1998) (same); *Moscowitz v. Brown*, 850 F.Supp. 1185, 1192 (S.D.N.Y. 1994) (same). *See also Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1035 (noting but finding no need to hold that under Illinois law an at-will employee has no contract upon which to base § 1981 claim). *Compare, e.g., Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018–20 (4th Cir.1999) (finding that contractual relationship exists between at-will employees and employers for purposes of § 1981); *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*, 160 F.3d 1048, 1050–51 (5th Cir.1998) (concluding that amendments to § 1981 included in 1991 Civil Rights Act reflected intent to include at-will employees within scope of § 1981); *Lazaro v. Good Samaritan Hosp.*, No. 98 Civ. 5980, 1999 WL 297483, *5 (S.D.N.Y. May 6, 1999); *Curtis v. DiMaio*, 46 F.Supp.2d 206, 212 (E.D.N.Y.1999); *Harris v. New York Times*, No. 90 Civ. 5235, 1993 WL 42773, at *4 (S.D.N.Y. Feb.11, 1993). The question is currently pending before the Second Circuit. *See Lauture v. IBM*, 98 Civ. 4882 (S.D.N.Y. May 25, 1999), *appeal docketed*, 99–7732 (2d Cir. June 21, 1999). I could guess how the Second Circuit would rule, but it is not necessary to reach the issue, as I find that Plaintiffs have failed to demonstrate the existence of a hostile environment.

 To prevail on a hostile environment claim, a plaintiff must show "(1) that her workplace was permeated with dis-

criminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created a hostile environment to the employer." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996) (quoting *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995)). While "even a single episode of harassment, if severe enough, can establish a hostile work environment," *Richardson v. N.Y. State Dept. of Correctional Serv.,* 180 F.3d 426 (2d Cir.1999) (quoting *Kotcher v. Rosa and Sullivan Appliance Ctr.,* 957 F.2d 59, 62 n. 4 (2d Cir.1992)), there must be "more than a few isolated incidents of racial enmity" for racist comments, slurs, and jokes to constitute a hostile work environment. *See Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986). "Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (quoting *Bolden v. PRC, Inc.,* 43 F.3d 545, 551 (10th Cir.1994)). Courts are to consider cumulatively the totality of the circumstances, with an eye towards the quantity, frequency, and severity of the allegedly harassing conduct, in order to obtain a realistic view of the working environment. *See Schwapp,* 118 F.3d at 111 (citations omitted).

With these guidelines in mind, the Court turns to the events alleged by Plaintiffs to have constituted a hostile environment. Plaintiffs testified to the following incidents that occurred prior to their June 10 resignation: first, Corliss made racially offensive remarks to their co-worker Hunter in April 1998, although they did not know exactly what or how numerous the remarks were;[5] second, in April or May, Corliss told Tranquille that "blacks and Puerto Ricans are lazy," made two disparaging comments about Mexicans, commented that blacks and Puerto Ricans were "bringing down" Middletown, and made disparaging remarks about his ex-wife's son who "thinks he's black";[6] third,

---

5. Whidbee appeared to testify that Plaintiffs were unaware that Corliss had made this unidentified comment to Hunter until Hunter so informed them at the time of Plaintiffs' June 16 meeting with Grable:

Q. When did Jamie Hunter tell you about the [unidentified April] remarks?

A. When me and Shirlene were telling Patrick [Grable] about the remarks he was calling us. (Whidbee Dep. at 78.)

6. Tranquille testified to the following:

Q. If you could tell me what specific racial comments Mr. Corless [sic] made in April . . . ?

A. I understand. Basically the comments I'm talking about is the blacks and Puerto Ricans again. Because he always talked about blacks and Puerto Ricans and Mexicans and talked about Ozzie [a co-worker] again.

Q. What was the specific comment; do you remember?

A. Again, that Jose [another co-worker], who is Puerto Rican, does more work than Ozzie, who is Mexican, and Puerto Ricans are harder workers than Mexicans, and then he made comments about Ozzie; that Ozzie smelled and all these other comments. (Tranquille Dep. at 55.)

. . . . .

Q. Do you recall specifically what [Corliss] said?

. . . . .

A. He told me that because his wife had children with Mexicans, he did not like Mexicans, and he felt that his wife's children's father was—because he was Mexican he didn't like to work, and he was an alcoholic, and that he'd talk about his alcoholism and different things.

Q. Was this his wife's ex-husband that he was talking about?

A. Yes. He also made a comment how Middletown was getting worse because of the blacks and the Puerto Ricans, and they are bringing down Middletown. (*Id.* at 57–58.)

. . . . .

A. He talked about how he didn't appreciate how [two other African–American employees] called him "homey," or whatever terms they used towards him, and that blacks need to stop with the slang, and he was talking about his ex-wife's son who thinks he's black, and how he don't appreciate his black friends coming over to the house.

. . .

Q. Were any supervisors present when Corless [sic] made any of these comments to you?

A. Like I said, it was just me and him in the break room. (*Id.* at 59.)

in early June, Whidbee heard Corliss tell Hunter that he was a "lazy black boy;" fourth, also in early June, Whidbee heard Corliss tell Hunter that he had a rope to hang Hunter;[7] fifth, on June 5, Hunter told Tranquille that Corliss and another white employee had called her a "skinny black bitch"; and sixth, on June 9, Hunter told them Corliss had referred to a co-worker as a "lazy black snake." In addition, Plaintiffs identified four incidents that occurred after they resigned but before they left McDonald's: first, that on June 11, Corliss, in two separate incidents, referred to both Whidbee and Tranquille as "black sheep";[8] second, on June 15, their co-worker George Doty told them that he heard Corliss say he "still couldn't stand black folk"; and third, on June 17 or 18, Corliss made offensive remarks about the

Texas dragging death and Tawana Brawley incidents.[9] Whidbee also testified that at some point "not after June," another crew person told her that Corliss had called Plaintiffs "black bitches," but was unable to recall more precisely the date of this remark. (Whidbee Dep. at 90.) The August incident, in which Corliss called Hunter "Buckwheat," is irrelevant to Plaintiffs' claim, because they had long since left McDonald's and were no longer exposed to the allegedly hostile environment.[10]

The facts in this case contrast with those in cases where hostile environment claims have been upheld against summary judgment motions. For example, in *Torres v. Pisano*, 116 F.3d 625 (2d Cir.1997), the plaintiff, a woman of Puerto Rican ancestry, testified that her supervisor habitually

---

7. Whidbee gave the following account of the incident at her deposition:

Q. Did Mr. Hunter ever tell you about any other comments made by Corless [sic] to him other than the ones that were made in April of 1998?

A. He called him a black lazy—that he was lazy, and he called him—and told him that he had a rope in the back shed to hang his butt.

Q. About the lazy comments, did he just say he was lazy or he said you are a lazy black so and so?

A. That he's a lazy black boy because he don't like to work. (Whidbee Dep. at 81.)

8. Whidbee's account of the occurrence was as follows:

Q. What exactly did [Corliss] say?

A. He said, "You know your wife won't like that black sheep touching you."

Q. Do you know what he was referring to?

A. Yes. Jose—the maintenance man—he wiped something off my leg. That's when he called me—"You know your wife won't like that black sheep touching your leg." (*Id.* at 97.)

Tranquille testified to a similar comment on the same day:

Q. [I]n what context did Corless [sic] make [the "black sheep"] comment?

A. Me and Jose were talking, and Jose was like, "We need to hang out sometime," and Rich [Corliss] said, "You know your wife

wouldn't like you hanging out with that black sheep." (Tranquille Dep. at 69.)

9. Tranquille testified to the following:

Q. What other racial slurs are you referring to [in Plaintiff's Exhibit D5]?

A. After Patrick [Grable] talked to him on that Friday, the following week—I don't recall exactly what day—it was Jamie, me, and I'm not positive, but I'm pretty sure Tina was there, and we were all in the grill, and I was cutting up bagels and Rich made a comment. He was like—I don't recall how it started, but we started talking about the guy in Texas that got dragged by the van—by the truck, and he was like, we don't know the whole story, and the media is making it out to be more than it is, and that we don't know what he did to these people for them to do that to him. He must have caused it somehow. And that's when he said he wanted to buy a pickup truck just like that.

And he was talking about Al Sharpton and that he's a rich, black man trying to make money, and how Tawana Brawley was a liar.

Q. And [Corliss also said] that he wanted to buy a pick-up truck just like that one?

A. Yes. (Tranquille Dep. at 72–73.)

10. At a trial on the merits, Plaintiffs might be able to introduce the "Buckwheat" comment as corroboration of Corliss's earlier remarks, but on this motion I am accepting everything they allege as true, so this particular remark adds nothing to my analysis.

referred to her as a "dumb cunt" and "dumb spic," made insulting remarks about the size of her buttocks, made sexual innuendos towards her, crudely indicated to other employees his desire to have sex with her, told her to stay home and collect welfare like the rest of the "spics," remarked to others that when the plaintiff called in sick she was "probably out sucking cocks to earn extra money," and allowed visitors to the office to throw money on the table and order the plaintiff to strip. *See id.* at 628. Similarly, in *Schwapp,* several of the plaintiff's fellow police officers made, in plaintiff's presence, a number of racially offensive comments, which included the word "nigger." *See id.* at 108–09. When the plaintiff complained to his lieutenant, he was told that he "should not expect his fellow workers to exhibit the same courtesy" as he did towards them, and that he "should not be so sensitive." *Id.* at 108.

This Court is mindful of the Second Circuit's recent admonition that such egregious cases as *Torres* and *Schwapp* do not establish the threshold of what is actionable as a hostile environment. *See Richardson v. N.Y. State Dept. of Correctional Serv.,* 180 F.3d 426, 439 (2d Cir.1999). In *Richardson,* the plaintiff, an African–American, alleged numerous incidents involving racial slurs during her three and one-half year employment as a clerk in a correctional facility: an instructor in a stress management session at the facility, while offering an example of a stressful situation, referred to a local African–American family and a bar patronized mainly by African–Americans; one of the plaintiff's supervisors stated in the plaintiff's presence that certain African–American murder suspects looked like "apes or baboons," and another supervisor was present and laughed at the comment; on Halloween, a co-worker said to the plaintiff and others "all you spooks have a nice Halloween," and the plaintiff's co-workers turned to look at her when that remark was made; during a training seminar, one co-worker made repeated references to "Arnold Schwarzenigger," and another

commented that an unidentified Caucasian had "some nerve bringing his brown-skinned wife to the party"; one of her supervisors commented on photographs of African–American inmates by remarking that "black people are so dark you can't see them anyway"; an unidentified co-worker referred to the plaintiff by stating that he did not know that "there were any light-skinned niggers" working at the facility; an unidentified co-worker called the plaintiff "nigger"; during a training session, a co-worker stated that he referred to inmates as "Buckwheat"; and two co-workers distributed a copy of a racially offensive joke that included use of the word "nigger." The plaintiff's complaints about the first five of these incidents were corroborated by an investigation by the corrections department's Affirmative Action Office. *See id.* at 433–34. In reversing summary judgment for the defendant, the Second Circuit determined that, in finding that the alleged harassment lacked the necessary severity, the district court had erred in its overreliance on the fact that none of the incidents to which the plaintiff was subjected was physically threatening. Despite the lack of physical threats, the Court noted, a reasonable factfinder could well have concluded that the incidents identified by Richardson altered negatively the terms and conditions of her employment, particularly given that even a single incident of harassment may rise to the requisite level of severity. *See id.* at 440.

■ Even in view of this most recent caveat from the Second Circuit that courts are to be broadly circumspect in affording every permissible inference to plaintiffs in assessing hostile environment claims, the facts in the present case are simply too far removed from the level of severity or pervasiveness required by that court to establish the existence of a hostile environment. The evidence demonstrates that Corliss made disparaging remarks on twelve separate occasions over the span of roughly three months, broken down as follows: six

occasions prior to Plaintiffs' resignation; four occasions after Plaintiffs resigned but before they left McDonald's; one comment some six weeks after they departed; and one comment that Whidbee was unable to place within this chronology. As noted above, the lone post-employment incident cannot be deemed to have contributed to a hostile environment for Plaintiffs and must therefore be disregarded. Although Corliss's remarks began in April 1998, Plaintiffs' testimony establishes that they were aware of only the following comments before they resigned on June 10: the comments Corliss made about blacks and Hispanics while having lunch with Tranquille in April or May; the "skinny black bitch" remark that Hunter reported to Tranquille on June 5; and the "lazy black snake" comment that Hunter relayed to Plaintiffs on June 9. In addition, Whidbee testified that Corliss made the "lazy black boy" and "rope in the back shed" comments in "[e]arly June", but could not recall more specifically the date of this statement. (Whidbee Dep. at 82.) Assuming that "early June," according to Whidbee's recollection, includes a date before June 10, Plaintiffs knew about four incidents involving offensive comments prior to their resignations. Except for the one incident where Corliss made remarks to Tranquille in April or May, Plaintiffs only became aware of Corliss's statements in the brief period between June 5 and June 10, the day they resigned. Given the short time frame in which Plaintiffs were aware of more than one offensive remark by Corliss—five days—Corliss's behavior cannot be characterized as sufficiently "severe" or "pervasive" to support a hostile environment claim. See de la Concha v. Fordham Univ., 5 F.Supp.2d 188, 190 (S.D.N.Y.1998) (finding racially offensive comments, including the word "spic," by plaintiff's supervisor over four or five month period insufficient to withstand summary judgment), aff'd, 173 F.3d 843 (2d Cir.1999); Bolden v. New York City Housing Auth., No. 96 Civ. 2835, 1997 WL 666236 at *2 (S.D.N.Y. Oct. 27, 1997) (finding five offensive racial references by plaintiff's supervisor, including use of the epithet "nigger," made over a period of six weeks insufficient as a matter of law to establish hostile environment claim).

It is also significant that two of the comments of which Plaintiffs were aware before June 10—specifically, "skinny black bitch" and "lazy black snake"—were not made in Plaintiffs' presence, as in the above cited cases, but rather, were relayed to them by Hunter. Although second-hand comments can be relevant to the hostile environment analysis, see Schwapp, 118 F.3d at 111–12, these statements are of less probative value than those perceived by a plaintiff directly. See id. at 112. Also noteworthy is the fact that all but one of the remarks ("skinny black bitch") were made with reference to employees other than Plaintiffs. "[T]he impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." Gleason v. Mesirow Financial, Inc., 118 F.3d 1134, 1144 (7th Cir.1997). Moreover, unlike Schwapp and Richardson, Corliss was the sole discriminatory actor in this case.[11] By contrast, the facts as alleged in Richardson, in which the plaintiff was exposed to discriminatory conduct from multiple individuals, including two of her supervisors, can be said to have described a hostile "environment"—i.e., one's surrounding circumstances or conditions—in the most literal sense of the term. See, e.g., Waltman v. Int'l Paper Co., 875 F.2d 468, 471 (5th Cir.1989) (denying summary

11. Tranquille testified that on June 5, Hunter told her that another employee, identified only as "Charlotte," was involved in the incident in which Corliss called Tranquille a "skinny, black bitch." (Tranquille Dep. at 48–49.) The record does not reveal how "Charlotte" was involved, and here again, Tranquille is testifying about something Hunter told her. While comments need not be made in a plaintiff's presence to have an impact on her work environment, on the present state of the record, we are dealing with double hearsay of the vaguest nature, which is inadmissible to prove the truth of the assertions (i.e., Hunter's statement to Tranquille regarding "Charlotte's" participation).

judgment on hostile environment claim where several different employees touched plaintiff in sexual manner and directed sexual comments toward her).

Perhaps most significant is the fact that the conduct alleged in cases such as *Torres, Schwapp,* and even *Richardson* could obviously be found by a reasonable trier of fact to have made performance of the plaintiffs' jobs unendurable. Here, though Corliss's slurs were unquestionably hurtful, despicable, and inexcusable, they cannot be said to have made the execution of Plaintiffs' job duties so intolerable as to "alter the conditions of their work environment," especially given the fact that Plaintiffs were only aware of more than one offensive incident for a few days before they resigned rather than give management an opportunity to correct the situation. Giving Plaintiffs the benefit of every reasonable inference, I find that the offensive conduct that they have established is neither severe nor pervasive enough to support their hostile environment claim.

█ Defendants also argue that even if Plaintiffs have stated a viable hostile environment claim, there is no ground upon which they can be held liable. In cases where the discriminatory conduct giving rise to a hostile environment is attributable to a co-worker rather than a supervisor, the plaintiff must demonstrate that management either "provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Van Zant,* 80 F.3d at 715 (quoting *Murray,* 57 F.3d at 249). Additionally, action taken by management must be "reasonably likely to stop the harassment." *Knabe v. Boury Corp.,* 114 F.3d 407, 414 (3d Cir.1997). In this case, it is undisputed that McDonald's anti-harassment policy was visibly posted in the employee break area throughout the entire period of Plaintiffs' employment there, and that Grable and other supervisors were available to receive employee complaints. Moreover, Grable, having spoken to Corliss within four days of Plaintiffs' initial complaint, took sufficiently prompt action. *See id.* at

413 (finding that manager's meeting with offending employee to discuss alleged harassment within one week of complaint was sufficiently prompt). The fact that Plaintiffs took offense because Grable did not take action on the very day that they complained is not dispositive. Further, Grable indicated to Plaintiffs that he intended to research McDonald's anti-harassment procedures. Finally, Grable subsequently issued Corliss a written warning and advised him that he would be dismissed if his offensive conduct continued. Such warnings have been held to be sufficient in other cases, *see, e.g., Blankenship v. Parke Care Centers, Inc.,* 123 F.3d 868, 873–74 (6th Cir.1997), *cert. denied,* 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998); *Knabe,* 114 F.3d at 412–14, and plaintiffs have pointed to no case law suggesting that the measures taken by Grable could not be considered "reasonably likely" to stop the harassment by Corliss. I also note in this regard that Plaintiffs have no right to insist upon any particular form of discipline, *see Knabe,* 114 F.3d at 414, yet it was their pique at Grable's failure to fire Corliss on the spot that impelled them to resign.

This, however, is a case in which the actions taken by management, while "reasonably likely to stop the harassment," failed to stop it. Corliss was impervious to the warnings he was given. If I had found sufficient evidence of a hostile work environment to withstand this motion, I would have allowed the case to go to trial on the reasonableness of McDonald's response.

█ Plaintiffs also assert claims under § 1981 against Ed and John Garzarelli in their individual capacities as the owners of the Middletown McDonald's. In order for individual liability under § 1981 to attach, the plaintiff must demonstrate "some affirmative link to causally connect the actor with the discriminatory action." *Allen v. Denver Pub. Sch. Bd.,* 928 F.2d 978, 983 (10th Cir.1991). *See also Hicks v. IBM,* 44 F.Supp.2d 593, 597 (S.D.N.Y. 1999); *Hardy v. New DN Co.,* No. 95 Civ.

5818, 1997 WL 666212, *12 (S.D.N.Y. Oct.24, 1997); *Johnson v. Resources for Human Dev., Inc.,* 843 F.Supp. 974, 978 (E.D.Pa.1994). Here, apart from their failure to establish a hostile environment, Plaintiffs have made no showing whatsoever of a causal relationship between the Garzarellis and the harassment Plaintiffs suffered from Corliss. The Garzarellis were not involved with in-store personnel matters, and there is no evidence that they received Plaintiffs' complaints about Corliss. Accordingly, Plaintiffs' claims against the Garzarellis are dismissed.

*New York State Human Rights Law Claim*

■ Plaintiffs have also asserted a claim under New York Executive Law Sections 296 and 297. Subsection 9 of § 297 provides a cause of action to any person claiming to be aggrieved by an unlawful discriminatory practice "unless such person had filed a complaint hereunder or with any local commission on human rights." In the present case, Plaintiffs admitted in their depositions that they filed administrative charges against Defendants with the New York State Division of Human Rights ("the Division") based on the same claims and occurrences that are at issue in this case, and have submitted no evidence to this Court that the Division has made any disposition of those charges.

The filing of a complaint with the Division bars the commencement of a judicial action based on the same incident or discriminatory grievance. *See Emil v. Dewey,* 49 N.Y.2d 968, 428 N.Y.S.2d 887, 406 N.E.2d 744 (1980); *James v. Coughlin,* 124 A.D.2d 728, 729–30, 508 N.Y.S.2d 231 (1986). Accordingly, summary judgment on Plaintiffs' state claims is granted.

*Constructive Discharge*

■ Plaintiffs next argue that they were constructively discharged as a result of their allegedly hostile work environment and the failure of Defendants to take adequate remedial measures with respect to their complaints. To establish a constructive discharge, a plaintiff must demonstrate that the employer deliberately made his or her working conditions "so intolerable that [the plaintiff] was forced into an involuntary resignation." *Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 360 (2d Cir.1993) (quoting *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983)).

■ Plaintiffs have shown no facts even suggesting a deliberate effort on the part of Defendants to render intolerable their working conditions. During their meetings, Grable had indicated a willingness—if equivocal at certain points—to redress Plaintiffs' grievances, and did so within a reasonably prompt period of time. Also significant are Plaintiffs' admissions in their depositions that they would have resigned regardless of any remedial steps taken by Grable. Under these circumstances, Plaintiffs fall far short of the required showing to survive summary judgment on their constructive discharge claim. *See, e.g., Arroyo v. Westlb Admin., Inc.,* 54 F.Supp.2d 224, 231 (S.D.N.Y.1999) (summary judgment granted on constructive discharge claim where Hispanic plaintiff showed, without more, that he was subjected' to a series of racial epithets). *Compare, e.g., Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1186–88 (2d Cir.1987) (reversing summary judgment for employer on constructive discharge claim where plaintiff's supervisor criticized plaintiff's performance in ethnically degrading terms, company vice-president advised plaintiff to resign, and supervisor placed plaintiff on 30 days probation, telling him employment would be terminated regardless of job performance). I therefore dismiss this claim as well.

This constitutes the decision and order of the Court.