Wayne **CURTIS**, Juan Gonzales, Anthony Dupree, Lenora Young, Lamont Killian, Patrick Thomas and Renee Hatch, Plaintiffs,

v.

**AIRBORNE FREIGHT CORPORATION d/b/a Airborne Express, Defendant.**

No. 98 Civ. 4062(SAS).

United States District Court, S.D. New York.

Jan. 11, 2000.

ness" in New York.

Trevor A. Reid, Jonathan S. Gould, Trevor A. Reid, P.C., Bronx, NY, for plaintiffs.

Eric P. Simon, Seth H. Borden, Kreitzman, Mortensen, Simon & Irgang, New York City, for defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

In this employment discrimination action, plaintiffs Wayne Curtis, Juan Gonzalez, Anthony Dupree, Lenora Young, Lamont Killian, Patrick Thomas and Renee Hatch allege that their employer, Airborne Freight Corporation d/b/a Airborne Express ("Airborne"), subjected them to a racially hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–1 et seq., and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 et seq. Defendant now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, defendant's motion is granted in its entirety.

## I. Background

### A. Factual Background

The following facts are taken from the amended complaint, the parties' Rule 56.1 statements and relevant deposition testimony. Unless otherwise indicated, the facts are undisputed.

Airborne is a Washington corporation which provides express freight and package delivery services throughout the United States. *See* Amended Complaint ("Am. Compl.") ¶¶ 18–19; Statement of Material

Facts in Support of Defendant's Motion for Summary Judgment ("Def.56.1") ¶ 1.[1] Airborne operates a branch terminal in Elmsford, New York. Am. Compl. ¶ 19. The Elmsford terminal employs approximately one-hundred couriers who transport freight and packages throughout Westchester County. *Id.* Plaintiffs are couriers employed in Airborne's Elmsford facility. *Id.* ¶¶ 10, 21. With the exception of Gonzalez who is Hispanic, all of the plaintiffs are African–American. *Id.* ¶¶ 10–17.

From November 1996 to September 1998, Matt Zaranski was one of approximately eight supervisors at the Elmsford facility. *See id.* ¶ 22; Def. 56.1 ¶ 4. Zaranski reported directly to Felix "Bud" Patterson, an Airborne District Field Services Manager stationed in Elmsford. *See* Am. Compl. ¶ 23; Def. 56.1 ¶ 3. Patterson was at all relevant times the senior management official at the Elmsford facility. Def. 56.1 ¶ 3. Patterson and Zaranski are both Caucasian. Am. Compl. ¶ 22.

Airborne's Elmsford couriers, including plaintiffs, are represented by Local 295 of the International Brotherhood of Teamsters. *Id.* ¶ 24. At all relevant times, the terms and conditions of plaintiffs' employment were governed by a collective bargaining agreement between Airborne and Local 295 (the "CBA").[2] Def. 56.1 ¶ 14. The CBA includes a four-step grievance and arbitration procedure for resolution of all disputes between Airborne and its Elmsford employees. *Id.* ¶ 15. The CBA also provides for the designation of a "shop steward" who is responsible for, among other things, handling the couriers' complaints and filing grievances with the company. *Id.* ¶ 16. Plaintiff Wayne Curtis is, and was at all relevant times, Local 295 shop steward for the Elmsford facility. *Id.* ¶ 17.

Except for Killian and Dupree, each plaintiff alleges a single incident of harassment by Zaranski. Am. Compl. ¶ 30.[3] Killian claims he was harassed on one occasion by Zaranski and on a separate occasion by Patterson. *Id.* ¶¶ 30(G)-(H). Dupree alleges that he was harassed by Zaranski on two occasions. *Id.* ¶¶ 30(C)-(D). All of the alleged incidents of harassment occurred between November 1996 and September 1997. *Id.* ¶ 30. It is plaintiffs' theory that all of the alleged incidents of harassment were racially motivated. *Id.* However, only two of the nine alleged incidents include arguably racist comments. *Id.* ¶¶ 30(G), (I).

Although defendant concedes that Zaranski had altercations with each plaintiff, defendant denies that these altercations constitute illegal racial harassment.[4] The specific details surrounding the alleged incidents of harassment are set forth immediately below.

1. Plaintiffs do not contest any portion of defendant's Rule 56.1 statement. *See* Plaintiffs' Memorandum of Law in Opposition to Defendant Airborne Freight's Motion for Summary Judgment ("Pl.Opp.") at 7.

2. The CBA expired by its terms on February 28, 1999. Def. 56.1 ¶ 14.

3. Neither the Complaint nor the Amended Complaint makes any allegations of discrimination with respect to plaintiff Young. In her deposition testimony, however, Young describes a February 1997 altercation with Zaranski. *See infra* Part I.A.4. In its Rule 56.1 statement and its moving papers, defendant assumes that Young's allegations of race discrimination are based on the February 1997 altercation. *See* Def. 56.1 ¶¶ 36–40. Plaintiffs do not object, nor do they offer evidence or argument concerning other specific incidents of harassment involving Young. *See* Pl. Opp.; Plaintiff's Statement of Undisputed Material Facts ("Pl.56.1"). Accordingly, for purposes of this motion, I treat the February 1997 altercation as Young's single allegation of harassment by Zaranski.

4. Defendant also denies that Zaranski and Patterson made the two arguably racist comments alleged by plaintiffs. *See* Def. 56.1 ¶¶ 51, 61. However, defendant adopts plaintiffs' version of events with respect to the two statements for purposes of its summary judgment motion. *See id.; see also infra* notes 8, 9.

### 1. Juan Gonzalez

Gonzalez is a part-time employee at the Elmsford facility. *See* 1/29/99 Deposition of Juan Gonzalez ("Gonzalez Dep.") at 20.[5] Gonzalez makes morning deliveries and sorts packages for afternoon deliveries. *See id.* However, Gonzalez leaves work at 12:15 p.m. each day and does not himself make afternoon deliveries. *See id.*

On one occasion in November 1996, Zaranski instructed Gonzalez to move several boxes that were stacked against Gonzalez's delivery truck. *See id.* at 21; Def. 56.1 ¶ 18. Zaranski told Gonzalez to put the stacked boxes inside—rather than next to—his truck. *See* Gonzalez Dep. at 21. In response, Gonzalez told Zaranski: "I do not do afternoon deliveries, those boxes stay there. . . . You can go and talk to Tom Grimaldi, which is another supervisor, if there [is] a problem with this." *Id.* at 21–22. When Gonzalez refused to move the boxes, Zaranski yelled at him. Def. 56.1 ¶ 19. Gonzalez described the incident as follows:

> A:  ... I told [Zaranski] to go see Jim Grimaldi if there was a problem with this, and I guess in retaliation maybe I went over his head and he didn't like it so he got real upset and kept arguing and yelling at me, and I told him, "Do not yell at me, I'm not one of your kids."
>
> Q:  What was he saying?
>
> A:  He's saying "you're going to put them in your truck" and he told me I better wise up and shut my fucking mouth before he writes me up for insubordination. Then he walked away.

Gonzalez Dep. at 24. At no point during this altercation, nor at any other time, did Zaranski make any racial or ethnic comments to Gonzalez. *See id.* at 36. Nor did Gonzalez ever hear Zaranski make a racial or ethnic comment to any other driver. *See id.* at 39. Other than the November 1996 incident, Gonzalez never had any problems with Zaranski. *See id.* at 24–25, 36, 38, 40.

Gonzalez did not report the November 1996 incident to Patterson or to any other Airborne supervisor. *See id.* at 39. Gonzalez did complain to Curtis, his shop steward, immediately following the altercation with Zaranski. *See id.* at 37. Gonzalez told Curtis: "I don't know what [Zaranski's] problem is, but he's yelling at me and I don't appreciate him bumping me off." *Id.* However, Gonzalez did not tell Curtis that he believed Zaranski's behavior was racially motivated. *See id.* at 39. Gonzalez filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 22, 1998, more than one year after his November 1996 altercation with Zaranski. Def. 56.1 ¶ 23.

### 2. Wayne Curtis

Each Airborne courier is assigned to a specific geographic delivery route. Am. Compl. ¶ 21. During what is called the "morning breakdown", couriers identify and collect all outgoing freight to be delivered within their geographic route. *See* Def. 56.1 ¶¶ 8–11; 1/14/99 Deposition of Wayne Curtis ("Curtis Dep.") at 50. Once the couriers have collected their freight, they "scan" the freight into handheld computers. *See* Curtis Dep. at 50–51. Scanning enables Airborne to keep track of every piece of freight it sends out for delivery. *See id.* at 51. Supervisors conduct periodic audits to determine whether couriers are properly scanning their freight. *See id.* at 99. This audit process is known as "back-scanning." *See id.*

On one occasion in December 1996, Zaranski "back-scanned" a Caucasian courier named Charlie Judson. *See id.* During the back-scan, Zaranski somehow corrupted Judson's initial scan forcing Judson to repeat the entire scanning process. *See id.* Judson called Curtis over to where Judson was standing and began to com-

---

**5.** Unless otherwise indicated, the cited portions of deposition testimony are attached as exhibits to the September 22, 1999 Declaration of Seth H. Borden in Support of Defendant's Motion for Summary Judgment ("Borden Decl.").

plain about Zaranski's disruptive back-scan. *See id.* Zaranski ran over to the two men, went "nose to nose" with Curtis and shouted repeatedly "mind [your] own fucking business ... shithead." *Id.* at 99–100. In response, Curtis "took two fingers and placed [them] on Zaranski's chest and gently moved [Zaranski] out of [his] space." *Id.* Zaranski "cursed" at Curtis and then walked away. *See id.*

Curtis continued to talk with Charlie Judson about the incident. *See id.* Curtis testified as follows about what happened next:

> While I was [talking with Judson], [Zaranski] had gone around the [conveyor] belt and come up on the other side of the belt and started cursing at me again. At that point I lost it. I jumped over the belt and I went for him. Fortunately, Tommy Grimaldi who had come down the belt for the second portion of the discussion saw me jump over the belts and grabbed me just as I was going for Zaranski. I threw Tommy off and went back towards Zaranski again, and Tommy grabbed me again the second time.

*Id.* at 101. After Grimaldi pulled Curtis away from Zaranski, Curtis took a walk outside to "cool off". *See id.* at 101. When Curtis returned, he and several supervisors went to Patterson's office to discuss the incident. *See id.* According to Curtis, Patterson asked him "what it would take for that situation never ever to happen again." *Id.* at 102. Curtis told Patterson that "as long as [Zaranski] never went nose to nose with [him] again", the two men "would never have a problem." *Id.*

Although Curtis and Zaranski never formally reconciled, Curtis testified that the two men informally reached a mutual understanding. *See id.* Curtis stated:

> A: ....[S]ince that time [the December 1996 incident] on a personal basis, I've never had any conflict with [Zaranski] again in that nature other than the normal bickering back and forth be-

tween what's right on a grievance and what's not.

> Q: Normal union management stuff?

> A: Right, other than that there has been nothing personal. In fact, we've always been very cordial with one another from that point forward....

*Id.* at 102–03.

At no time during the December 1996 incident did Zaranski make racial or ethnic comments to Curtis. *See id.* at 114. Moreover, Curtis testified that at the time the incident occurred, he did not believe it was racially motivated. *See id.* Curtis filed a charge of discrimination with the EEOC on January 22, 1998, more than one year after his December 1996 altercation with Zaranski. *See* Def. 56.1 ¶ 30; Curtis EEOC Charge of Discrimination, Ex. D to Borden Decl.

### 3. Anthony Dupree

Incoming freight is transported to the couriers for identification and collection via a moving conveyor belt. Def. 56.1 ¶¶ 9–10. On one occasion in December 1996, Dupree was scanning packages on the conveyor belt when he accidentally hit the "stop button" with his leg and shut down the conveyor belt for approximately ten seconds. *See* 2/16/99 Deposition of Anthony Dupree ("Dupree Dep.") at 29–34. Dupree had done the same thing—inadvertently hit the stop button—six months earlier. *See id.* at 31–32. After the belt was reactivated, Zaranski walked over to Dupree and whispered, "Don't do that fucking shit again." *Id.* at 32. Zaranski made no other comments to Dupree regarding the December 1996 stop-button incident. *See id.* at 33.

At no time during the stop-button incident, nor at any other time, did Zaranski make racial comments to Dupree. *See id.* at 33, 62–63. Dupree never reported the stop-button incident to Patterson or to any other Airborne supervisor. *See id.* at 66. Dupree did complain to Curtis about the incident. Dupree told Curtis that he thought Zaranski "had a problem." *Id.* at

35. However, Dupree did not tell Curtis that he believed Zaranski's "problem" was racially motivated. *See id.*

Eight months later, on August 11, 1997, Dupree and Zaranski had a second altercation. On that date, Dupree ended up with an unusually large number of boxes to deliver. *See id.* at 44. Rather than roll the boxes out to his truck as was his normal practice, Dupree decided to back his truck up to a large bay door at the side of the terminal and load boxes directly off the conveyor belt into his truck. *See id.* However, the spot near the bay door where Dupree parked was typically used by another courier named Robbie Rollins. *See id.* at 47.[6] While Dupree was loading boxes, Zaranski approached, asked Dupree why he was parked in Rollings' space and told Dupree to move his truck. *See id.* at 49, 56. Dupree explained that he was just trying to load some heavy boxes, and that he would move the truck when he was finished. *See id.* at 49. In response, Zaranski called Dupree a "fucking asshole" and walked away. *See id.* at 50–51. As Zaranski was leaving, Dupree called after him to "come back and repeat [the comment] to [Dupree's] face." *Id.* at 50.

Five minutes later, Zaranski returned, and the two men had the following exchange:

> [Zaranski] walked to my right side and he stood there in my face, and I asked him, I said, "Why don't you get out of my face". I said, "You already, you know, called me a name". I said, "Why don't you move, get out of my face". He said, "Well, you better watch how you dismiss me". Then [he] walked away.

*Id.* at 51.

At no time during the August 1997 incident did Zaranski make any racial comments to Dupree. *See id.* at 52. In addition, other than the December 1996 stop-button incident and the August 1997 incident, Dupree never experienced any prob-

lems with Zaranski. *See id.* at 62–63. Like the stop-button incident, Dupree did not report the August 1997 incident to Patterson or to any other Airborne supervisor. *See id.* at 66. Dupree did report the August 1997 incident to Curtis. However, he did not tell Curtis that he thought Zaranski's comments were racially motivated. *See id.* at 56. Dupree filed a charge of discrimination with the EEOC on January 22, 1998, more than a year after the December 1996 stop-button incident and five months after the August 1997 incident. *See* Def. 56.1 ¶ 35; Dupree EEOC Charge of Discrimination, Ex. D. to Borden Decl.

### 4. Lenora Young

In addition to freight and packages, the Elmsford facility receives and delivers letters. *See* 1/29/99 Deposition of Lenora Young ("Young Dep.") at 30. At the start of each day, couriers scan and sort incoming letters. *See id.* at 30–36. During the letter sort, piles of letters are dumped onto several tables. *See id.* at 32. Couriers stand at the tables, scan each letter and place the scanned letters into bins to be sorted geographically by other couriers. *See id.* at 32, 33.

On one occasion in February 1997, Young and another courier named Steven Simpson were scanning letters at different ends of a table. *See id.* at 49–50, 56. Zaranski approached Young and stated: "Lenora, push the letters down. Push the letters down." *See id.* at 50. Apparently, Zaranski wanted Young to push unscanned letters down toward Simpson. Young told Zaranski that it was Simpson's job to push the letters. *See id.* at 50. Zaranski repeated that he wanted Young, not Simpson, to push the letters down the table. *See id.* at 58. Young again stated that it was not her job, and explained that she and Simpson had their own system for scanning letters. *See id.* Zaranski responded: "I just want you to push them

---

6. In fact, according to defendant, the space where Dupree parked was "assigned" to Rol-
lins. Def. 56.1 ¶ 55. Rollins is African–American. *See* Dupree Dep. at 47.

down and stop being a wise ass." *Id.* at 57.

At no time during the February 1997 letter-sort incident, nor at any other time, did Zaranski make racial or ethnic comments to Young. *See id.* at 83.[7] Young never reported the letter-sort incident to Patterson. Young did complain to supervisors Tom Grimaldi and Bernie Hamilton. She told them that "[Zaranski was] being ridiculous. What does this guy want? He's working us too hard." *Id.* at 86. Young did not, however, tell either Hamilton or Grimaldi that she believed Zaranski's actions were racially motivated. *See id.* Young also mentioned the incident to Curtis, but she never asked Curtis to file a grievance on her behalf. *See id.* at 88–89. Young filed a charge of discrimination with the EEOC on January 22, 1998, eleven months after her February 1997 altercation with Zaranski. *See* Def. 56.1 ¶ 40; Young EEOC Charge of Discrimination, Ex. D to Borden Decl.

### 5. Renee Hatch

Each delivery a courier makes along his or her route is called a "stop". *See* 2/12/99 Deposition of Renee Hatch ("Hatch Dep.") at 45–46. In February 1997, Hatch was assigned a new route in Bronxville, New York. *See id.* at 45. Two weeks after Hatch started her new route, Zaranski told Hatch that she needed to make thirteen stops per hour. *See id.* Hatch was unable to meet this requirement; she could not maintain a rate of thirteen stops per hour on the new route. *See id.* at 46. As a result, Zaranski wrote a disciplinary letter citing Hatch for insubordination and lack of productivity. *See id.* at 44–46. The letter was placed in Hatch's personnel file. *See id.*

At no time did Zaranski ever make any racial comments to Hatch. *See id.* at 151–52. Hatch did not report the 13–stop incident to Patterson or to any other supervisor. *See id.* at 171, 189. Hatch did complain to Curtis, although she was unsure whether he filed a grievance on her behalf. *See id.* Hatch filed a charge of discrimination with the EEOC on January 22, 1998, eleven months after her February 1997 altercation with Zaranski. *See* Def. 56.1 ¶ 44; Hatch EEOC Charge of Discrimination, Ex. D to Borden Decl.

### 6. Patrick Thomas

On August 6, 1997, Thomas began his shift at the Elmsford facility at 7:15 a.m. Def. 56.1 ¶ 45. When he arrived at work, Thomas was "feeling fine." *See* 2/8/99 Deposition of Patrick Thomas ("Thomas Dep.") at 17–18. About thirty minutes after Thomas started sorting mail, Curtis handed him a disciplinary letter from Zaranski. *See id.* at 22–24. The letter cited Thomas for "careless and neglectful performance". *See* 8/6/97 Step IV Letter from Zaranski to Thomas ("8/6/97 Letter"), Ex. E to Borden Decl. Apparently, Thomas had failed to meet his previously demonstrated rate of deliveries and his required "wrap time"—the time in which drivers are expected to complete their total deliveries. *See id.;* Def. 56.1 ¶ 47; Thomas Dep. at 17, 23. Pursuant to the CBA, the disciplinary letter imposed a three-day suspension. *See* 8/6/97 Letter, Ex. E to Borden Decl.; Def. 56.1 ¶ 47. Thomas testified that he was upset about receiving the letter: "I felt that this—at this point when I received this letter, UPS was on strike. So I didn't feel this should come in consideration of wrap time on your performance on the roads because we had [a greater] amount of freight tha[n] we normally would have." Thomas Dep. at 23.

About thirty minutes after Thomas received the disciplinary letter, he began to feel ill. *See id.* at 24. Thomas informed Zaranski that he was sick and wanted to go home. *See id.* at 16, 25. Zaranski told Thomas: "That is bullshit.... You blacks are all alike, every time there is a problem

---

7. Young did testify, however, that she overheard Zaranski tell plaintiff Thomas that "all you are alike and you all want to go home sick." Young Dep. at 84; *see infra* Part I.A.6.

on the job, you want to go home."[8] *Id.* Both men "cursed" at each other, and Thomas ultimately went home. *See id.* at 25–26.

Thomas never reported the August 6, 1997 incident to Patterson or to any other Airborne supervisor. *See id.* at 32. However, Thomas did complain to Curtis. According to Thomas, "Curtis is in charge of [the couriers]. If we have a complaint, we make it to him." *See id.* Other than during the August 6 incident, Thomas never heard Zaranski make any racial or ethnic comments. Def. 56.1 ¶ 52. Similarly, Thomas did not experience any serious problems with Zaranski save for the August 6 incident. *See id.;* Thomas Dep. at 44–45. Thomas filed a charge of discrimination with the EEOC on January 22, 1998, six months after the August 6 incident. *See* Thomas EEOC Charge of Discrimination, Ex. D to Borden Decl.

### 7. Lamont Killian

Sometime during the winter of 1997, Patterson held a meeting during which he informed the Elmsford couriers that they were not to wear pens in their hats. *See* 2/5/99 Deposition of Lamont Killian ("Killian Dep.") at 26, 29. On one occasion in August 1997, Killian was standing near the conveyor belt with a pen tucked into his hat. *See* Def. 56.1 ¶ 61; Killian Dep. at 25–26. Patterson approached Killian and reprimanded him for violating the dress code. *See* Def.56.1 ¶ 61; Killian Dep. at 26. According to Killian, Patterson made the following statements: "[H]e told me that I'm out of uniform for having my pen in my hat because that's what the pen holder in the shirt is for.... He told me that I was no longer standing on the corner, I was working for him." *Id.* at 26–27.

In addition, Killian overheard Patterson remark to an unidentified third party that Killian "look[ed] like them guys in the videos that these kids watch, that rap music." *Id.* at 28. Killian considers both the "standing on the corner" and "rap music" statements to be racial slurs. *See id.* at 31–36.[9] Other than these two statements, Patterson has never made any racial comments to Killian. *See id.* at 36.

On September 2, 1997, Killian had a second altercation—this time with Zaranski. Def. 56.1 ¶ 62. On that date, Killian received nine computers as well as several other packages to deliver along his route. *See* Killian Dep. at 37–38. Killian did not have enough room in his truck for both the packages and the computers. *See id.* According to Killian, supervisor Tom Grimaldi advised him to leave the computers in the Elmsford facility while he delivered all of his other packages, at which time Killian could return for the computers and make a second delivery run. *See id.* at 38. Following Grimaldi's instructions, Killian stacked six computer boxes on the passenger side of his truck and three computer boxes behind his truck. *See id.* The stacked computer boxes obstructed an adjacent walkway. *See id.*

While Killian was loading the non-computer freight into his truck, Zaranski approached and told him, "Lamont, you have to move the computers." *Id.* at 41. When Killian explained that he did not have any more room in his truck, Zaranski walked away. *See id.* Zaranski returned, however, and again instructed Killian to move the computers. *See id.* at 42. Killian responded as follows: "I said, 'I don't have any room.' I showed him and I said Tom-

8. Although Zaranski denies making this statement, *see* 8/16/99 Deposition of Matthew Zaranski at 52–53, defendant has accepted Thomas's version of events as undisputed for purposes of its summary judgment motion. *See* Def. 56.1 ¶ 51; *supra* note 4. *But see supra* note 7 (describing Young's testimony that Zaranski told Thomas "you are all alike" as opposed to "you blacks are all alike").

9. Although Patterson denies making both the "standing on the corner" and "rap music" statements, *see* Def. 56.1 ¶ 61; 8/5/99 Deposition of Felix "Bud" Patterson at 48, defendant has accepted Killian's version of events as undisputed for purposes of its summary judgment motion. *See* Def. 56.1 ¶ 61; *supra* note 4.

my told me to leave the computers here and to come back and get them ... so the computers are staying." *Id.* Zaranski left but came back a third time and yelled, "Lamont move the fucking computers." *Id.* at 42. When Killian again refused to move the boxes, Zaranski told him to go home.[10] At no point during this altercation, nor at any other time, did Zaranski make any racial or ethnic comments to Killian. *See id.* at 52.

Although Killian never reported the September 2, 1997 incident to Patterson, Killian testified that he "complained to everybody [other than Patterson]" about Zaranski on a "daily basis." *See id.* at 71–72; Pl. 56.1 ¶ 2. However, Killian's daily complaints consisted of vague statements such as "[Zaranski] is out to get me for some reason." *See id.* at 71–74. There is absolutely no evidence that Killian ever told his supervisors that Zaranski was discriminating against him because of his race. *See id.*

Killian filed a charge of discrimination with the EEOC on January 22, 1998, five months after his August 1997 altercation with Patterson and three months after his September 1997 altercation with Zaranski. *See* Killian EEOC Charge of Discrimination, Ex. D to Borden Decl.

### 8. Curtis's September 2, 1997 Grievance

On September 2, 1997, Curtis filed an official grievance against Zaranski. *See* 9/2/99 Local 295 Grievance Form signed by Wayne Curtis, Ex. C to Borden Decl. The September 2 grievance calls for Zaranski's termination citing his "[a]busive, intimative [sic], threatening, and harassive [sic] language." *Id.* The grievance lists Curtis as the sole complainant, and it fails to set forth a single fact concerning the nature of his complaint. *See id.* Indeed, the complete text of the grievance reads as follows:

| | |
|---|---|
| Grievance: | Abusive, intimative, threatening, and harassive language |
| Nature of Grievance: | This has been the methods used by [ ] Matt Zaranski since the beginning of his employment at Airborne Express. |
| Remedy Sought: | His Termination |

*Id.* Nowhere does the grievance state that race was a motivating factor for Zaranski's behavior or Curtis's complaint.

On October 9, 1997, a "Step 3" hearing was convened to address Curtis's September 2 grievance. Def. 56.1 ¶ 71. In attendance were Curtis, Patterson, Airborne Regional Field Services Manager Steve Eller and Local 295 Business Agent Tim Ruggio. *See id.;* Curtis Dep. at 123. During the one-month time period between the filing of his grievance and the Step 3 hearing, Curtis did not inform Patterson of the identity—or the existence—of other grievants. Def. 56.1 ¶ 70. At the October 9 meeting, Curtis gave a detailed description of his December 1996 altercation with Zaranski. *See* Curtis Dep. at 126. Curtis also stated, for the first time, that there were six other employees who had had altercations with Zaranski. *See id.* Although Curtis identified the six additional plaintiffs, he declined to provide any details regarding their experiences with Zaranski feeling that "it needed to come from them in their own words." *Id.* When pressured, Curtis stated that Zaranski had used profanity with these other employees. *See id.* at 127. However, Curtis never indicated to Patterson, Eller or Ruggio that he and the other plaintiffs believed Zaranski's actions were racially motivated. *See id.* at 129–31.

Following the October 9 meeting, neither Curtis nor the other plaintiffs ever provided Patterson, Eller or Ruggio with additional facts or statements regarding their altercations with Zaranski. Def. 56.1 ¶ 75. Curtis did not pursue arbitration of his grievance as provided for in the CBA. *See id.* at ¶ 76; Curtis Dep. 138–39.

---

**10.** Killian did not, in fact, go home. He was advised by Curtis to stay at work and com-

plete his route which is what Killian apparently did. *See id.* at 39.

## B. Procedural Background

As set forth above, each plaintiff filed a charge of discrimination with the EEOC on January 22, 1998. Am. Compl. ¶ 7. On March 12, 1998, the EEOC issued a "right to sue" letter to each plaintiff. *Id.* On May 19, 1998, plaintiffs commenced this litigation.

In their initial complaint, plaintiffs alleged that Airborne discriminated against them based on their race and national origin in violation of Title VII, NYSHRL § 296 and 42 U.S.C. § 1981. Plaintiffs asserted both a hostile work environment discrimination claim and a disparate treatment discrimination claim. Defendant moved to dismiss plaintiffs' complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) arguing that plaintiffs' allegations of discrimination were both time-barred and insufficient to state a claim for relief. On December 17, 1998, I dismissed plaintiffs' section 1981 claims but upheld their Title VII and state law claims for hostile work environment discrimination and disparate treatment discrimination. *See Curtis v. Airborne Freight Corp.*, 98 Civ. 4062, 1998 WL 883297 (S.D.N.Y. Dec.17, 1998). On July 23, 1999, after the close of discovery and in response to defendant's motion for Rule 11 sanctions, plaintiffs voluntarily withdrew their disparate treatment claims and filed an amended complaint.[11] The amended complaint alleges only that defendant discriminated against plaintiffs by subjecting them to a racially hostile work environment.

Defendant now moves for summary judgment, renewing its original contentions—namely that plaintiffs' claims of race discrimination are both time-barred and insufficient as a matter of law.

## II. Applicable Legal Standard

A motion for summary judgment may be granted only when "the pleadings, deposi-tions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law. A reasonably disputed, legally essential issue is both genuine and material and must be resolved at trial." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir.1999) (internal quotations and citations omitted).

In assessing the record to determine whether genuine issues of material fact are in dispute, courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). However, if the moving party meets its initial burden, the non-moving party may not rely on conclusory allegations or speculation to create factual disputes. Instead, the non-moving party "must produce specific facts indicating that a genuine issue of fact exists. If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998)(internal quotations and citations omitted)(alteration in original).

In employment discrimination cases, courts must be particularly sensitive to the fact that evidence of discrimination is

---

**11.** All seven plaintiffs repudiated their allegations of disparate treatment during deposition discovery. *See* Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def.Mem.") at 2 n.1.

seldom overt; "[e]mployers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason expressly forbidden by law." *Bickerstaff v. Vassar College*, 196 F.3d 435, 447 (2d Cir.1999)(internal quotations omitted). However, courts must also "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.... Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances." *Id.*

## III. Discussion

In its motion, defendant argues that it is entitled to judgment as a matter of law on both procedural and substantive grounds. *First,* defendant contends that five of the plaintiffs—Gonzalez, Curtis, Dupree, Young and Hatch—are barred from asserting their Title VII discrimination claims, because they failed to file timely charges with the EEOC. *Second,* defendant contends that plaintiffs' claims are insufficient as a matter of law to support a finding of hostile work environment discrimination. Defendant's arguments are discussed in turn below.

### A. Time–Bar: The Continuing Violation Doctrine

Prior to commencing a Title VII action in federal court, a plaintiff must file a charge of discrimination with the EEOC. *See* 42 U.S.C. § 2000e–5(e). In states such as New York, the EEOC charge must be filed within 300 days of the alleged unlawful employment action.[12] *See id.* If a Title VII plaintiff fails to file a timely charge with the EEOC, his or her Title VII claim is time-barred. *See Butts v.*

*City of New York Dep't of Hous.*, 990 F.2d 1397, 1401 (2d Cir.1993).

The Second Circuit has recognized a narrow exception to the 300–day limitation period in cases involving a "continuing violation." *See Cornwell v. Robinson,* 23 F.3d 694, 703–04 (2d Cir.1994). Under the continuing violation doctrine, "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993).

The continuing violation doctrine applies "to cases involving specific discriminatory policies or mechanisms such as discriminatory seniority lists, or discriminatory employment tests." *Id.* (citations omitted). In contrast, "[d]iscrete incidents of discrimination that are unrelated to an identifiable policy or practice ... 'will not ordinarily amount to a continuing violation,' unless such incidents are specifically related and are allowed to continue unremedied for 'so long as to amount to a discriminatory policy or practice.'" *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir.1997)(quoting *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir. 1996)). As a general rule, courts in the Second Circuit have viewed continuing violation arguments with disfavor. *See, e.g., Rose,* 13 F.Supp.2d at 520; *Riedinger v. D'Amicantino,* 974 F.Supp. 322, 325 (S.D.N.Y.1997); *Lloyd v. WABC–TV,* 879 F.Supp. 394, 399 (S.D.N.Y.1995).

In the instant case, it is undisputed that Gonzalez, Curtis, Dupree, Young and Hatch failed to file timely discrimination charges with the EEOC. The incidents of harassment alleged by these five plaintiffs

---

**12.** Because New York has a state agency that is authorized to address charges of employment discrimination, the statute of limitations for filing an EEOC charge is 300 days. *See* 42 U.S.C. § 2000e–5(e); *Rose v. Port Auth. of N.Y. & N.J.,* 13 F.Supp.2d 516, 519–20

(S.D.N.Y.1998). In states without such an agency, plaintiffs must file a charge of discrimination within 180 days of the alleged unlawful employment action. *See* 42 U.S.C. § 2000e–5(e); *Rose,* 13 F.Supp.2d at 519–20.

occurred more than 300 days before they filed their EEOC charges on January 22, 1998. *See supra* Parts I.A.1–5. Accordingly, unless the 300–day limitations period is tolled by the continuing violation doctrine, these plaintiffs are time-barred from asserting their Title VII claims.[13] Moreover, because this case does not involve an overt discriminatory policy such as a seniority list or an unlawful employment test, plaintiffs' alleged incidents of harassment can only constitute a continuing violation if they "are specifically related and are allowed to continue unremedied for so long as to amount to a discriminatory policy or practice." *Lightfoot*, 110 F.3d at 907. In other words, plaintiffs' "[a]llegations of discrimination must reflect 'a dogged pattern of [discrimination] that persisted unremedied, despite [plaintiffs'] complaints, over a number of years.'" *Rose*, 13 F.Supp.2d at 520 (quoting *Cable v. New York State Thruway Auth.*, 4 F.Supp.2d 120, 125 (N.D.N.Y.1998)). Where a plaintiff fails to report incidents of alleged discrimination to his or her supervisors, "it cannot fairly be said that the [employer] 'permitted' [the discrimination] to continue unremedied." *Ryduchowski v. Port Auth. of N.Y. & N.J.*, 96 Civ. 5589, 1998 WL 812633, *6 (E.D.N.Y. Nov.19, 1998); *see also Cable*, 4 F.Supp.2d at 125.

Plaintiffs contend that the nine alleged incidents described above, *see supra* Part I.A., collectively comprise a "course and pattern of harassment, humiliation and discriminatory conduct." Am. Compl. ¶ 34. Accordingly, it is plaintiffs' position that the allegations of Gonzalez, Curtis, Dupree, Young and Hatch are rendered timely because they are specifically related to the incidents of discrimination alleged by Thomas and Killian—both of whom filed timely charges with the EEOC.

■ As discussed *infra* Part III.B., plaintiffs' nine alleged incidents of harassment do not constitute a "course and pattern" of racial discrimination.[14] However, even assuming that the incidents alleged by plaintiffs do reflect a "course and pattern" of discrimination, the continuing violation exception is inapplicable. Plaintiffs failed to put defendant on notice of the alleged incidents of discrimination by Zaranski and Patterson, and therefore "it cannot fairly be said that [defendant] 'permitted' [the discrimination] to continue unremedied." *Ryduchowski*, 1998 WL 812633, *6.[15]

Gonzalez, Hatch, Dupree and Thomas each testified that they never reported their altercations with Zaranski to Patterson or to any other Airborne supervisor. *See supra* Parts I.A.1, 3, 5–6. Young and Killian testified that although they never reported Zaranski's behavior to Patterson, they did complain about Zaranski to other Airborne supervisors. *See supra* Parts I.A.4, 7. However, there is absolutely no evidence that either Young or Killian ever

---

**13.** Dupree's EEOC charge is untimely with respect to only one of his alleged incidents of discrimination—the December 1996 "stop-button" incident. *See supra* Part I.A.3. Dupree's second allegation of unlawful discrimination occurred in August 1997, and therefore it is within the 300–day limitations period. Accordingly, Dupree is only time-barred from asserting Title VII claims based upon the December 1996 incident.

**14.** The question of whether plaintiffs' nine alleged incidents of discrimination are "specifically related" such that they comprise a pattern of harassment is identical to the question of whether plaintiffs have made a sufficient legal showing of hostile workplace discrimination. *See Wise v. New York City Police*

*Dep't*, 928 F.Supp. 355, 366–67 (S.D.N.Y. 1996)("As other courts have noted, '[b]y its nature, a claim of "hostile environment discrimination" turns on the existence of a continuing violation'"). Accordingly, this issue is addressed *infra* Part III.B. in connection with defendant's substantive challenges to plaintiffs' claims.

**15.** Indeed, although I found plaintiffs' continuing violation argument sufficient at the *motion to dismiss* stage, I specifically noted that "in order to prevail on their argument that there is a continuing violation, plaintiffs must establish that defendant allowed the conduct to continue unremedied." *Curtis*, 1998 WL 883297, at *4 n. 3.

told these other supervisors that they believed Zaranski's actions were racially motivated. Young explicitly stated that even though she complained about Zaranski to supervisors Grimaldi and Hamilton, she did not tell them that she believed Zaranski's behavior toward her was based upon her race. *See* Young Dep. at 86. Similarly, when counsel for defendant asked Killian if he ever told his supervisors "why" he thought Zaranski was "out to get [him]", Killian stated: "I just said that I think he is out to get me and I need to get out of his group, that's all I ever said . . . ." Killian Dep. at 73.

Finally, although Curtis complained to Patterson about his December 1996 altercation with Zaranski immediately following the incident, Curtis never told Patterson that he believed Zaranski was harassing him because of his race. *See supra* Part I.A.2. Indeed, at the time of the December 1996 incident, Curtis himself did not believe Zaranski's actions were racially motivated. *See* Curtis Dep. 114.

Plaintiffs point to the fact that on September 2, 1997, Curtis, as shop steward, filed a grievance against Zaranski on plaintiffs' behalf. *See* Pl. Opp. at 5. However, the September 2 grievance makes no mention of the nine alleged incidents of harassment; indeed, it fails to even mention the existence of any complainant other than Curtis. *See supra* Part I.A.8. Nor does the September 2 grievance state that Zaranski discriminated against any Airborne employee based upon race or ethnic origin. *See id.* When defendant convened a Step 3 hearing in October 1997 to investigate the grievance, Curtis did identify the other six plaintiffs as complainants. However, Curtis again failed to mention that he and the other plaintiffs believed Zaranski's behavior was racially motivated. *See id.*

The bottom line is that plaintiffs never once informed their supervisors that they believed Zaranski was discriminating against them based upon their race. Therefore, although plaintiffs have arguably demonstrated that defendant knew Zaranski was unpopular and difficult to work with, plaintiffs have put forth no evidence that defendant had notice of Zaranski's alleged racially discriminatory behavior. As a result, plaintiffs have failed to show that defendant "allowed" or "permitted" Zaranski's alleged discriminatory behavior "to continue unremedied for so long as to amount to a discriminatory policy or practice." *Lightfoot,* 110 F.3d at 907 (internal quotations omitted). Accordingly, Gonzalez, Curtis, Dupree, Young and Hatch cannot invoke the continuing violation exception, and their Title VII claims are time-barred.[16]

## B. Hostile Work Environment

### 1. General Legal Standard

"Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In the instant case, plaintiffs

16. Plaintiffs' reliance on *Draeger v. Bronx–Lebanon Hosp. Ctr.,* 98 Civ. 3688 HB, 1999 WL 562103 (S.D.N.Y. Aug.2, 1999), is misplaced. *See* Pl. Opp. at 2–3. *Draeger* involved a single plaintiff who alleged that she was repeatedly sexually harassed by her supervisor for nearly ten years during which time she made numerous explicit complaints about the harassment to company officials. *See id.* at *1–3. When Draeger filed her EEOC charge, it was timely as to some incidents of harassment but not others. At the motion to dismiss stage, the court found that plaintiff "had alleged facts sufficient to constitute a continuing violation." *Id.* at *4.

In contrast, the instant case involves multiple plaintiffs who each allege a single instance of discrimination but who failed to make any explicit complaints regarding that discrimination to their supervisors. Moreover, unlike *Draeger,* this case has reached the summary judgment stage, and therefore plaintiffs can no longer rely on the bare allegations of the complaint. To avoid an adverse ruling, plaintiffs were obligated to put forth proof sufficient to raise a genuine issue of material fact regarding the existence of a continuing violation. As set forth above, plaintiffs have failed to make such a showing.

assert that defendant subjected them to a hostile work environment in violation of Title VII and NYSHRL § 296.[17]

■ To maintain a hostile work environment claim under Title VII, a plaintiff must demonstrate "that [her] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [her] work environment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997)(internal quotations omitted).[18] A hostile work environment claim "will succeed only where the conduct at issue is so severe or pervasive as to create an objectively hostile or abusive work environment, and where the victim subjectively perceive[s] the environment to be abusive." *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 436 (2d Cir.1999)(internal quotations omitted)(alteration in original).[19]

■ In order to determine whether a workplace is permeated with "severe and pervasive" discrimination sufficient to support a Title VII claim, courts must consider the totality of the circumstances, and they must evaluate " 'the quantity, frequency, and severity' " of the alleged incidents of discrimination. *Id.* at 437 (quoting *Schwapp*, 118 F.3d at 111). "For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that [i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Schwapp*, 118 F.3d at 110 (internal citations and quotations omitted)(alteration in original). *See also Richardson*, 180 F.3d at 437 ("Isolated incidents or episodic conduct will not support a hostile work environment claim.").

As a general rule, hostile work environment claims in the Second Circuit have survived summary judgment in cases where the record reflects either a continuous and repeated pattern of explicit racial slurs or a few particularly severe incidents of discrimination. For example, in *Schwapp*, the Court of Appeals reversed the district court's grant of summary judgment where plaintiff, the first African–American police officer employed by the town of Avon, alleged that he was subjected to ten racially hostile incidents during a ten-month period, including his fellow officers' repeated use of the term "nigger" in his presence and the distribution of a racially offensive joke involving the term "nigger". 118 F.3d at 108. When Schwapp complained about these incidents to his supervisor, he was told that he "had to understand the history of an all white male department and that at one time all the crimes in Avon were committed by blacks and that guys started to stereotype people." *Id.*

Alternatively, the plaintiff in *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir.1995), alleged a single instance of sexual harass-

**17.** New York courts require the same standard of proof for claims brought under NYSHRL § 296 as for those brought pursuant to Title VII. *See Leopold v. Baccarat*, 174 F.3d 261, 264 n. 1 (2d Cir.1999). Accordingly, my findings with respect to plaintiffs' Title VII hostile work environment claim apply with equal force to plaintiffs' state law hostile work environment claim.

**18.** A Title VII plaintiff must also show that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Schwapp*, 118 F.3d at 110. However, the Supreme Court recently held that an employer is presumed absolutely liable where the hostile environment was created by the victim's supervisor, although the employer may assert an affirmative defense to rebut the presumption of liability. *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998). In the instant case, the alleged discrimination was perpetrated by plaintiffs' supervisors and defendant has not asserted an affirmative defense to rebut liability. Accordingly, defendant will be presumed liable for any actionable discriminatory conduct by Zaranski and Patterson.

**19.** Defendant does not directly dispute that plaintiffs subjectively perceived their environment as hostile. Accordingly, this discussion focuses on the objective prong of plaintiffs' hostile workplace claim.

ment, namely that she was sexually assaulted by two of her supervisors. The Court of Appeals reversed · the district court's grant of summary judgment with respect to plaintiff's hostile work environment claim finding that "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and creates an abusive work environment for purposes of Title VII liability." *Id.* at 1305.

The line between "sporadic racial slurs" and a "steady barrage of opprobrious racial comments" is particularly well-drawn in *Richardson,* the Second Circuit's most recent formulation of the Title VII racially hostile workplace standard. *Richardson* involved an African–American plaintiff who alleged that she was subjected to a racially hostile work environment while employed by the New York State Department of Correctional Service at two different facilities over a period of six years. 180 F.3d at 433. During plaintiff's first assignment at the Auburn Correctional Facility ("ACF"), she was allegedly subjected to the following incidents of explicit racial harassment:

> [O]ne of [plaintiff's] supervisors referred to Blacks as "apes or baboons" and stated that African–Americans are "so dark you cannot see them anyway," one co-worker referred to her as a "light-skinned nigger," another called her "nigger," yet another went out of his way on one occasion to use the word nigger in her presence, others circulated a joke that disparaged Blacks and referred to them as "niggers," while still others used the terms "spooks" and "Buckwheats" to refer to African–Americans.

*Id.* at 439. In light of both the quantity and frequency of alleged racial slurs and the repeated use of the " 'unambiguously racial epithet ... nigger' ", the Second Circuit reversed the district court's grant of summary judgment with respect to Richardson's claim of hostile environment discrimination at ACF. *Id.* at 439–40 (quoting *Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir.1993)). The

Second Circuit explained that although "[a] factfinder may well conclude that the ACF environment was not so objectionable as to alter negatively the terms and conditions of a reasonable person's employment", the court could not state, as a matter of law, "that the record evidence compels only that result." *Id.* at 440.

In contrast, the Second Circuit upheld the lower court's grant of summary judgment with respect to Richardson's allegations of hostile environment discrimination at the second facility where she was assigned, Cayuga Correctional Facility ("CCF"). Although plaintiff alleged fifteen incidents of harassment at CCF, only three of the alleged incidents involved racial slurs. *See id.* Plaintiff's remaining twelve allegations of harassment at CCF included repeated comments by co-workers and supervisors to the effect that plaintiff was "stupid", "crazy", and "ignorant" and would "do anything for money". *See id.* at 435. Plaintiff also alleged that her supervisors and co-workers left horse manure in plaintiff's parking space; scratched plaintiff's car; struck plaintiff in the head with a rubber-band; locked plaintiff's filing cabinets and failed to pass along plaintiff's phone messages. *See id.* Despite the sheer number of alleged incidents of harassment, the Court of Appeals found that because the majority of the incidents were devoid of "racial overtones", Richardson's allegations were insufficient to maintain a hostile work environment claim with respect to CCF. The *Richardson* court stated:

> In contrast to our conclusion about ACF, we agree with the district court's conclusion that Richardson's allegations were insufficient as a matter of law to establish that an objectively hostile working environment existed at. CCF. Of the fifteen incidents about which Richardson complains, only three have any racial overtones whatsoever, and these— that one co-worker made a disparaging comment about Native Americans, that another once said that all of the Black

inmates looked alike, and that a third once made a remark that Jewish people "like to hold on to their money"—are isolated, mild, and cannot, under any objective standard, suffice to create a hostile working environment. Indeed, only one involves Richardson's protected racial category. The balance may reflect that Richardson was not liked by her CCF co-workers and may be relevant to her retaliation claim, which is discussed below. But to sustain a Title VII hostile environment claim Richardson must show more—she must produce evidence that she was discriminated against because of her race, and this she has not done.

*Id.* at 440.

### 2. Plaintiffs' Allegations of Hostile Environment

■ Applying both the legal standard set forth above and the facts of *Richardson* to the instant case, it is clear that plaintiffs cannot maintain a claim of hostile environment discrimination against defendant. Plaintiffs do not allege—and there is no evidence of—a repeated pattern of explicit racial slurs by any of plaintiffs' supervisors or co-workers. Nor do plaintiffs allege a single severe incident of racial harassment sufficient in and of itself to alter the conditions of plaintiffs' employment. Succinctly stated, "the facts in the present case are simply too far removed from the level of severity or pervasiveness required by [our Court of Appeals] to establish a hostile environment." *Whidbee v. McDonald's Corp.*, 75 F.Supp.2d 183, 190 (S.D.N.Y.1999)(granting summary judgment for defendant on plaintiff's hostile environment claim).

### a. Gonzalez, Curtis, Dupree, Hatch, and Young (and Killian's altercation with Zaranski)

Similar to Richardson's allegations regarding CCF, seven of the nine incidents of harassment alleged by plaintiffs are utterly devoid of "racial overtones". *See supra* Part I.A. Indeed, although Gonzalez, Curtis, Hatch, Young and Killian each complain of a single incident of harassment by Zaranski, and Dupree complains of two incidents of harassment by Zaranksi, all six plaintiffs explicitly testified that Zaranksi never made any racial comments to them during the alleged incidents or at any other time. *See supra* Parts I.A.1–5, 7. The undisputed facts surrounding each alleged incident of harassment further undermine any finding that Zaranksi's behavior toward these five plaintiffs was racially motivated. *See id.* For example, Gonzalez testified that Zaranski's November 1996 outburst in which he told Gonzalez to "shut [his] fucking mouth" was motivated not by Gonzalez's race, but by Gonzalez's reference to another supervisor: "I told [Zaranski] to go see Jim Grimaldi if there was a problem with this, and I guess in retaliation maybe I went over his head and he didn't like it so he got real upset and kept arguing and yelling at me." Gonzalez Dep. at 24.

As a second example, Curtis's altercation with Zaranski arose out of an earlier incident between Zaranski and a Caucasian driver. *See supra* Part I.A.2. Moreover, Curtis testified that at the time his altercation with Zaranski occurred, Curtis did not believe it was racially motivated. *See* Curtis Dep. at 114. During a meeting with Patterson immediately following the altercation, Curtis never mentioned that race was an issue. Instead, Curtis told Patterson that as long as Zaranski "never went nose to nose with [him] again", the two men "would never have a problem." *Id.* at 102. In fact, Curtis testified that since his single altercation with Zaranski, the two men have "been very cordial with one another" and have experienced no additional conflict. *Id.* at 102–03.[20]

---

20. Plaintiffs improperly attempt to create an issue of fact with respect to Zaranski's racial animus by setting forth conclusory and speculative allegations. For example, plaintiffs point to the following statement by Young: "I knew [Zaranski] had a problem with blacks

There is no question that these five plaintiffs have put forth evidence tending to show that Zaranski was an ill-tempered, ineffective and wholly objectionable supervisor. However, Title VII only protects employees from improper discriminatory intimidation; it does not reach so far as to protect plaintiffs from undiscriminating intimidation by bullish and abusive supervisors. As the *Richardson* court stated, "to sustain a Title VII hostile environment claim [a plaintiff] must show more [than generic harassment]—she must produce evidence that she was discriminated against because of her race." *Richardson*, 180 F.3d at 440. Affording plaintiffs every permissible inference and viewing the record with particular sensitivity to the fact that evidence of discrimination is rarely overt, there is no other conclusion but that plaintiffs Gonzalez, Curtis, Dupree, Hatch, Young and Killian have failed to make even a threshold showing that Zaranski's behavior toward them was motivated by race.[21]

for some reason. I just—I felt it. He made you feel the tension. I have worked with plenty of supervisors. You can feel racial tension ...." Pl. Opp. at 12 (quoting Young Dep. at 77). Plaintiffs similarly cite the following statement by Dupree as evidence of Zaranski's racial animus: "He (Zaranski) might be prejudiced ... just by looking at him watching me up in my face, you know, during that time, calling me names ...." *Id.* (quoting Dupree Dep. at 64–65)(alteration in original). These allegations are insufficient to create an issue of fact at the summary judgment stage where plaintiffs "must produce specific facts indicating that a genuine issue of material fact exists." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Plaintiffs cannot rely "on conclusory allegations or unsubstantiated speculation" such as the statements set forth above to defeat defendant's motion. *Id.* In addition, because plaintiffs' allegations regarding Zaranski's racial animus are wholly subjective—for example, "I knew he had a problem ... I just—I felt it"—they are at most probative of whether plaintiffs subjectively perceived their work environment as abusive.

I also note that plaintiffs continue to make allegations and arguments regarding Zaranski's "disparate targeting of minorities", Pl.

### b. Killian and Thomas

Although plaintiffs Killian and Thomas have each alleged a single instance of harassment involving a racial slur, those instances are neither sufficiently severe nor sufficiently pervasive to create an objectively hostile or abusive work environment. Thomas claims that Zaranski told him: "You blacks are all alike, every time there is a problem on the job, you want to go home." Thomas Dep. at 16. Although Zaranski's alleged statement is an explicit and reprehensible racial slur, it cannot—standing alone—constitute the "steady barrage of opprobrious racial comments" necessary to constitute a racially hostile workplace. *See Schwapp*, 118 F.3d at 110–11.

Killian's single allegation regarding Patterson's racial comments is similarly insufficient to support a hostile workplace claim. Patterson allegedly told Killian to remove his pen from his hat because Killian was "no longer standing on a street corner." Killian Dep. at 26–27. As part of

Opp. at 11; *see also* Pl. 56.1 ¶¶ 3, 8–9, despite the fact that plaintiffs voluntarily withdrew their disparate treatment claims at the close of discovery. Although a workplace where African–American employees are alone targeted for harassment might certainly be considered "hostile", any argument by plaintiffs to that effect is improper and unfounded in the instant case because—as plaintiffs acknowledged when they withdrew their disparate treatment claims—such allegations have simply not been borne out by the evidence. Indeed, the evidence revealed that Zaranski was difficult and unpleasant to all employees, not just African–Americans.

**21.** Of course, even assuming Gonzalez, Curtis, Dupree, Young and Hatch could demonstrate that Zaranski's harassment was racially motivated, they are time-barred from asserting any Title VII claims based on those incidents. *See supra* Part III.A. However, the insufficiency of these plaintiffs' hostile workplace claims is still relevant for two reasons. *First,* it is an alternative ground for summary judgment with respect to these plaintiffs' Title VII discrimination claims. *Second,* it is a primary ground for summary judgment with respect to these plaintiffs' state law discrimination claims.

the same incident, Patterson also allegedly remarked that Killian "look[ed] like them guys in the videos that these kids watch, that rap music." *Id.* at 28. Although less explicit, Patterson's alleged comments are arguably racist because they appear to be based upon racial stereotypes such as "all African–American men like rap music" and "African–American men hang out on street corners doing nothing". That said, Patterson's statements cannot reasonably be considered anything more than an isolated racial slur. As set forth above, however, this type of isolated racial remark "cannot, under any objective standard, suffice to create a hostile work environment." *Richardson,* 180 F.3d at 440.

Because plaintiffs Curtis, Gonzalez, Dupree, Hatch and Young have failed to allege any incidents of racially discriminatory harassment, and because plaintiffs Thomas and Killian have each alleged a single incident of racially discriminatory remarks, plaintiffs cannot individually or collectively maintain their Title VII hostile workplace claims. Nor can plaintiffs maintain their state law hostile workplace claims. Accordingly, summary judgment is granted with respect to plaintiffs' federal and state hostile workplace discrimination claims.

## IV. Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted in its entirety. The Clerk of the Court is directed to close this case.

SO ORDERED: