**Lisa LUCENTI, Plaintiff,**

v̇.

**John E. POTTER, Postmaster General, Defendant.**

**No. 03 Civ. 4298(RWS).**

United States District Court, S.D. New York.

May 25, 2006.

Lloyd Somer, New York, NY, for Plaintiff.

Michael J. Garcia, United States Attorney for Southern District of New York, New York, NY (Rebecca C. Martin, Assistant U.S. Attorney, of counsel), for Defendant.

## OPINION

SWEET, District Judge.

The defendant John E. Potter, Postmaster General (the "Government") has moved under Rule 56, Fed.R.Civ.P., to dismiss the complaint of plaintiff Lisa Lucenti ("Lucenti"), alleging discrimination while employed by the United States Postal Service ("Postal Service"). For the reasons set forth below, the motion is granted.

### Prior Proceedings

Lucenti filed her complaint on June 12, 2003, alleging that she was subjected to a hostile work environment on the basis of gender and disability and was retaliated against for complaining about the alleged discrimination, that the Postal Service

failed to provide a reasonable accommodation for her alleged mental disability, and that she suffered intentional infliction of emotional distress.

Discovery proceeded, and the action was referred for settlement, which was not achieved.

The Government filed the instant motion for summary judgment on June 16, 2005. Lucenti filed her opposition on October 25, 2005. The motion was marked fully submitted upon the filing of the Government's reply on January 6, 2006.

### The Facts

The facts as set forth below are contained in the Government's Statement of Undisputed Facts pursuant to Local Rule 56.1 ("Government Statement") and the Plaintiff's Rule 56.1(b) Statement ("Plaintiff Statement") and are not in dispute except as noted.

Lucenti worked at the Postal Service's Lenox Hill facility ("Lenox Hill"), located in New York, New York, and joined the Postal Service in or about 1987 as a "sub carrier." By 1988, Lucenti was a regular carrier, and by 1990 she was a truck driver at the Lenox Hill facility in Manhattan, assigned to mail collection. In 1993, Lucenti's job changed from truck driver to foot carrier.

Lucenti bid for and obtained the position of an "auxiliary" letter carrier or "auxiliary end." Her position is also referred to as a "day router." An auxiliary end is a carrier who is assigned to assist on a route that has more mail volume than one person can handle in an eight-hour workday, but not enough volume to justify assigning two people to that route full-time.

Lucenti provided auxiliary assistance to Route 2149, usually referred to as "Route 49," by casing, *i.e.*, sorting and delivering mail.

On or about October 1, 1992, Lucenti contacted an Equal Employment Opportunity ("EEO") counselor about her allegations that she had been subjected to harassment by Carrier Supervisor Walter Fox ("Fox"). According to Lucenti, she was told she did not have a case and did not pursue the EEO process. The matter was closed on October 15, 1992. Fox was transferred out of Lenox Hill.

According to Lucenti, the transfer resulted from Fox's sexual harassment of her and another female carrier. Fox acknowledged the accusations that he had discussed with co-employees Lucenti's complaint, that he had called Lucenti a "stiff," meaning someone who does not do their work, and that he spoke to other supervisors and informed Lois Hughes ("Hughes"), a subsequent supervisor of Lucenti, that Lucenti was part of the reason for his transfer.

In approximately calendar year 2002 or 2003, Fox spoke to acting manager David Pryor ("Pryor") of Lenox Hill and told Pryor that Lucenti had been part of the reason for his transfer from Lenox Hill. Pryor stated to Fox that Lucenti was a problem and that it was possible that he had spoken to Lucenti's supervisor Jankowski and other supervisors about Lucenti.

In 1995, Lucenti complained of being harassed by supervisor Edward Rossi ("Rossi"). According to Lucenti, Rossi stated that she had nice legs and commented on her breasts. Rossi ceased being her supervisor in 1995. Rossi informed Fox that ". . . he had a similar problem with Lucenti that I had," that Lucenti had also filed a sexual harassment claim against him and that was the reason that he was transferred to Grand Central Station.

After Rossi left his position as carrier supervisor in 1995, Lucenti told her co-

workers to stop making sexual comments to her "and they did. So they stopped." Lucenti Dep. Tr. at 59:25–60:7. According to Lucenti, the comments stopped temporarily and resumed up to the time of her deposition, and the comments included "stiff" and "cuckoo."

After Rossi departed, Lucenti was supervised by Hughes. Lucenti Dep. Tr. at 289:3–12. Lucenti testified that Hughes remarked that Lucenti was "the type of girl that should have a little puppy dog with her little skirt." Lucenti Dep. Tr. at 289:18–291:2. After these comments, Lucenti spoke to Hughes and asked her to be fair to her, after which Hughes and Lucenti got along well. Lucenti has conceded that Hughes did not discriminate against her on any proscribed ground, and that Lucenti never filed an EEO complaint against Hughes. Hughes wrote one disciplinary notice for Lucenti.

In 1996, station manager Phil Mazzio ("Mazzio") and area manager Roberto Agostini ("Agostini") were assigned to Lenox Hill and denied Lucenti's request for vacation time. Lucenti alleged that Mazzio and Agostini harassed her and filed a grievance regarding the denial of vacation time. Lucenti also filed an EEO complaint against Mazzio and Agostini, which was dismissed. Lucenti admits that in or around 1996, Agostini ceased communicating with her after an EEO representative spoke to Agostini about verbal harassment of Lucenti.

Lucenti has stated that during the calendar year 1998, any harassment subsided.

Lucenti has made no allegation of harassment or any discriminatory activity from the 1996 alleged incident with Mazzio and Agostini up through April 1999 when she was briefly supervised and allegedly harassed by Michael Harricharan ("Harricharan"), who wrote up a disciplinary charge on which, according to Lucenti, she was exonerated. According to Lucenti, Harricharan asked Lucenti out on a date, made lewd comments regarding her physical appearance, and would "eye" Lucenti with sexual overtones which made her feel very uncomfortable. Harricharan left Lenox Hill shortly after supervising Lucenti. Lucenti never filed an EEO complaint with respect to the alleged actions of Harricharan.

According to Lucenti, supervisor Michael Berger ("Berger") commented to her that her position on Route 49 was not an 8–hour assignment, criticized her for working too slowly, belittled her, made degrading comments, and increased her assignments unnecessarily.

Lucenti has alleged that in 1999 Pryor, supervisor Stephen Jankowski ("Jankowski"), and supervisor Valerie Barksdale ("Barksdale") pushed her to finish her work on Route 49, yelled at her, criticized her and called her a "stiff" because she was not working as quickly as they believed she should and, from time to time, would move her from Route 49 to other routes. She has alleged that Pryor would stand and watch how she worked, would yell and threaten to fire her because she wasn't "putting up the mail fast enough for him," and that "the way [Pryor] used to stare at me" was "sexual." Lucenti has alleged that Pryor moved the "route"—the work area where the carriers for Route 49 sorted and cased mail—into the middle of the work floor so that Lucenti and her partner would be seen at all times. Lucenti has claimed that Pryor "planted" first class mail that should already have been delivered in her mail tubs and falsely accused her of failing to deliver this mail, and that Pryor said that her workload on Route 49 was not a full-time job and instructed her to deliver mail in an additional building that was not on Route 49.

On or about January 19 and 24, 2000, Lucenti provided notes from her psychiatrist, Dr. Nehemia Zedek ("Dr.Zedek"), indicating that working overtime would exacerbate her alleged anxiety condition. Lucenti has alleged that despite these notes, management demanded that she deliver mail to this new building because Pryor "felt [she] didn't have enough mail to do" on Route 49, and that doing so resulted in her working overtime. After Dr. Zedek's notes were provided, Lucenti worked a total of approximately eleven hours of overtime over the course of two months until March 23, 2000, at which point Lucenti was absent from work for seven months. Payroll records show that Lucenti worked 144.82 hours of overtime in 1998 and 115.96 hours of overtime in 1999.

Barksdale issued a notice of removal to Lucenti on March 10, 2000, which stated in part as follows:

You are the Day Router for Route 21049 [*i.e.*, Route 49] when the volume warrants at Lenox Hill Station in New York City. You have been observed on several occasions finishing this end at 12:30 P.M.; and customers have stated while myself and T.S.P.O. Steve Jankowski went on a 3999 [annual observation of carrier by management] with you, that you always finish between 12:00 and 12:30 P.M. when your end tour is 3:00 P.M. Since this observation was brought to your attention you have purposely extended your office time allowing for the completion of your end to finish later in the day. Because of this observation Management has instructed you to begin the 350 East 77th Street building since December 1999, on Route 2150 avoiding this route from going into overtime and allowing you to absorb an eight hour day. Since this instruction has been given to you, you have failed to follow it and maintain schedule. I, Barksdale,

you[r] immediate supervisor have on several occasions asked you have you started the 350 East 77th building, each reply was "NO." You have been found to be insubordinate in following management instructions to you.

Lucenti has alleged that Barksdale harassed her by saying she "did not have enough mail in [her] hands," taking some personal items from Lucenti, and telling her on another occasion to get her outdoor gear from her locker so she could leave early to deliver mail. Lucenti also has alleged that Barksdale on one occasion instructed Lucenti to take lunch at a particular time and to tell other carriers to take their lunch at that time as well. Lucenti has admitted that she used the bathroom frequently and has alleged that Barksdale followed her to the bathroom and indicated to her that she should hurry and, further, told her that if she needed to use the bathroom, she would need a doctor's note. According to Lucenti, Barksdale accompanied her on her route, yelled at her, and threatened to fire her, as a consequence of which Lucenti suffered anxiety attacks and required hospitalization on three occasions.

On or about February 23, 2000, Lucenti contacted an EEO counselor regarding Barksdale and Pryor. On March 21, 2000, Lucenti signed a form withdrawing her EEO complaint, stating, "Personal Business, I drop the case." The form of withdrawal, signed by Lucenti, stated that "I fully understand that by withdrawing the complaint or allegation(s) I have withdrawn, I am waiving my rights to any further appeal of this allegation(s) through the EEO process. I further stipulate that my withdrawal did not result from threat, coercion, intimidation, promise or inducement."

According to Lucenti, on March 23, 2000, shortly after the March 10, 2000 notice of removal was issued, she suffered an anxiety attack which she alleged was occasioned by the "harassment" of Barksdale, Pryor, and Jankowski, and was driven to Lenox Hill Hospital by a supervisor. Lucenti was absent from work for seven months and did not return to work until October 2000.

Before Lucenti's return on or about October 13, 2000, Pryor was transferred from Lenox Hill and Keith Yenzer ("Yenzer") returned as station manager. Compl. ¶ 27.

On April 2, 2001, Lucenti approached a group of supervisors, including Vega and Jankowski, who were engaged in a discussion, to hand a medical note to Jankowski. According to Lucenti, Vega "screamed" at her to leave and pushed her shoulder, "not hard, he didn't push me hard or anything like that." Lucenti Dep. Tr. at 220:16–23. Lucenti testified that she called the police and filed a complaint against Vega, but that the entire matter was dropped. An investigation by the Postal Service was conducted into the incident and a notice of suspension was issued to Lucenti on June 21, 2001.

On September 13, 2001, Lucenti contacted the EEO office regarding the June 21, 2001 notice of suspension. On November 12, 2001, Lucenti withdrew her EEO complaint regarding this matter. The withdrawal form stated that,

I, Lisa Lucenti, do hereby voluntarily withdraw my EEO complaint in its entirety. I fully understand that by withdrawing the complaint I waive my rights to any further appeal through the EEO process. I further stipulate that my withdrawal did not result from any threat, coercion, intimidation, promise or inducement.

Lucenti has conceded that she had no problems with Yenzer, the station manager at Lenox Hill, during the 1997 to 1999 period. She has conceded that after Yenzer returned to Lenox Hill to replace Pryor as station manager Yenzer was not "aware of what I went through, the medication and all that stuff," and that "[w]hen he came back I wasn't performing my job duties like I used to." *Id.* at 65:20–21. Lucenti also has admitted that after Yenzer returned her work was and continues to be poor: "My work performance has failed constantly." According to Lucenti, she had problems in 1999 with Carrier Supervisor Harricharan and when Berger and Pryor began supervising the plaintiff.

Lucenti has admitted that after Yenzer returned he didn't "realize all the doctor's notes that were there, [could not] understand the medical condition that I was under . . . ," and that Yenzer would tell her that her route "has no mail" and she should finish, and that Yenzer instructed supervisors to write her up.

On April 26, 2001, management for the Postal Service and representatives of the National Association of Letter Carriers ("NALC") entered into an agreement regarding Lucenti's day router position on Route 49, stating as follows:

As per staffing meeting held above date between the NALC and management regarding the day router assignment for Rt. # 2149 assigned to L. Lucenti. It is agreed by all parties that the above day router assignment will be established as no more than a four hour assignment if volume warrants, along with other carrier duties to be assigned by management. This agreement is in effect immediately as per signatures of all parties below.

Martin Decl. Ex. P.

Lucenti has alleged that Yenzer tried to "abolish" her position on Route 49 and has testified that her position on Route 49 was not abolished, but was reduced from an

eight-hour to a four-hour position. Lucenti has stated that the reduction from eight to four hours in the time she is assigned to Route 49 "means they can put me all over the place."

In September 2001, Ayanna Kofi ("Kofi") began working at Lenox Hill as Lucenti's supervisor in Section D and met Lucenti for the first time. Kofi supervised Lucenti for approximately one year. According to Lucenti, Kofi frequently moved her off of her route to assist on other routes, told her not to "sit on the route," told her that her breaks were too long, followed her to the bathroom, or instructed her to get back to her work station if she walked off the work floor.

On October 5, 2001, a hearing was held by arbitrator Garry J. Wooters ("Wooters") on a grievance filed on Lucenti's behalf by Branch 36, National Association of Letter Carriers, AFL–CIO, regarding the alleged harassment from Pryor, Jankowski, and Barksdale. An opinion and award was issued by Wooters on November 4, 2001, and received by the Union on November 13, 2001.

In his award summary, Wooters found the following:

> Management violated the National Agreement when supervisors and managers acted in an inappropriate manner by yelling at the grievant and inappropriately threatening her with discipline. Management should cease and desist from this conduct and should make supervisors aware of their obligations in such cases.

In the arbitration award, Wooters noted that a number of employees testified that Supervisor Pryor had raised his voice to Lucenti; had yelled at her; that Lucenti was told not merely to limit her bathroom breaks, but that she could not go to the bathroom at all; and that Lucenti was accused of not working, yet a fellow employee stated that she had been working continuously.

On November 29, 2001, Kofi moved to terminate Lucenti by issuing a notice of removal regarding incidents occurring in September and October 2001. The notice of removal was challenged in a grievance proceeding and ultimately was rescinded because it was not issued in a timely fashion.

Lucenti has alleged that on March 18, 2002, Kofi screamed at her not to "sit on the route," clocked her work, threatened to remove her from her job, and followed her to the restroom, and that on March 19, 2002, Kofi singled her out to tell her to do her job differently.

Kofi issued a letter of warning to Lucenti on October 10, 2002. Lucenti instituted a grievance regarding the letter of warning, which was reduced to a "discussion."

With respect to the EEO proceedings underlying this lawsuit, Lucenti first contacted an EEO counselor on March 4, 2002, alleging that she had been discriminated against from 1990 to the time that she contacted the EEO office. The parties agreed to mediation, which was unsuccessful, and Lucenti filed her formal EEO complaint on September 10, 2002. On March 17, 2003, the EEO office dismissed Lucenti's complaint for lack of timeliness and for failure to state a claim.

Lucenti has alleged that supervisors Wiggs, Stensland, Murtha, and Tripp, who supervised her after she contacted the EEO office regarding the above-captioned lawsuit, watched her work and/or criticized her work performance as too slow. Lucenti has conceded that supervisors Wiggs, Stensland, and Tripp did not discriminate against her. Lucenti's actions regarding these supervisors were not made part of the EEO complaint that was filed by Lucenti and underlies the above-captioned

lawsuit. However, Supervisor Tripp was named in EEO complaints filed by Lucenti in calendar year 2002.

### Discussion

### I. The Standard for Summary Judgment

In deciding a motion for summary judgment, a court shall render judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000).

The moving party has the initial burden of showing that there are no material facts in dispute, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case, *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1187 (2d Cir.1987); *Eastway Const. Corp. v. New York,* 762 F.2d 243, 249 (2d Cir. 1985). However, the Court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If there is not, summary judgment is proper. *Id.* at 249–50, 106 S.Ct. 2505.

### II. Only The Claims Regarding Events Of March 18 And 19, 2002 Are Timely And Properly Exhausted

■ The vast majority of Lucenti's claims—those involving events occurring between 1990 and January 17, 2002—are untimely because Lucenti failed to timely exhaust her administrative remedies. Title VII is the exclusive remedy available to federal employees who allege discrimination on the basis of gender, national origin, religion, or race. *Brown v. Gen. Servs. Admin.,* 425 U.S. 820, 825–33, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Briones v. Runyon,* 101 F.3d 287, 289 (2d Cir.1996). Under Title VII, "a litigant must exhaust available administrative remedies in a timely fashion" as a prerequisite to gaining access to the federal courts. *Brown,* 425 U.S. at 832, 96 S.Ct. 1961. *See Fitzgerald v. Henderson,* 251 F.3d 345, 358–59 (2d Cir.2001) ("Title VII requires that an employment discrimination claimant pursue administrative procedures before commencing a lawsuit"). Federal employees pursuing claims under the Rehabilitation Act likewise must exhaust administrative remedies. *Bruce v. Dep't of Justice,* 314 F.3d 71, 74 (2d Cir.2002) ("An employee suing the federal government under the Rehabilitation Act must exhaust certain administrative remedies before initiating a lawsuit in federal court."); *Boos v. Runyon,* 201 F.3d 178, 181 (2d Cir.2000).

Timely exhaustion of administrative remedies requires that a federal employee comply with applicable EEOC regulations. *See* 29 C.F.R. § 1614; *Dillard v. Runyon,* 928 F.Supp. 1316, 1323 (S.D.N.Y.1996),

*aff'd,* 108 F.3d 1396 (C.A.D.C.1997). According to those regulations, "prior to filing a formal complaint, an employee who believes he is the victim of discrimination must consult an EEO Counselor" within forty-five days of the alleged discriminatory acts. 29 C.F.R. § 1614.105(a)(1); *see also Boos,* 201 F.3d at 181 (postal employee's discrimination claim barred where plaintiff failed to seek EEO counseling within forty-five days of the alleged discriminatory incidents). If the matter is not resolved after a mandatory counseling period, the employee may then file a formal written administrative complaint with the EEOC, which must be filed within fifteen days of the EEO Counselor's final interview with the employee. 29 C.F.R. § 1614.106(a), (b). The employee may not file in federal court until the administrative EEO process has been completed. *See* 29 C.F.R. 11614.407.

██ Courts must strictly adhere to such procedural requirements for gaining access to the federal courts. These timing requirements, though not jurisdictional, "are not to be disregarded by courts out of a vague sympathy for particular litigants." *Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 152, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1994). *See also Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 94, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990) (time limits should be strictly construed); *Dillard,* 928 F.Supp. at 1323.

In the EEO proceedings underlying the instant case, Lucenti contacted an EEO counselor on March 4, 2002 regarding events allegedly occurring between 1990 and January 17, 2002. Applying the forty-five-day rule, the only timely allegations in the complaint are those that are alleged to have occurred on or after January 18, 2002. The only acts alleged by Lucenti in her formal EEO complaint (filed on September 10, 2002) that fall within that time period are the alleged acts of Kofi occurring on March 18 and 19, 2002.

██ Further, Lucenti's prior contacts with the EEO office of the Postal Service on October 1, 1992 (regarding Fox), July 31, 1996 (regarding Mazzio and Agostini), February 23, 2000 (regarding Pryor and Barksdale), and September 13, 2001 (regarding Vega) establish the untimeliness of Lucenti's claims arising from these events. She failed to exhaust her claims pursuant to the administrative requirements. *See Brown v. Coach Stores, Inc.,* 163 F.3d 706, 712 (2d Cir.1998) (holding that purpose of exhaustion requirement is to give administrative agency opportunity to investigate, mediate, and take remedial action). Because Lucenti chose not to exhaust and pursue these claims, she is barred from pursuing them in this action.

██ In addition, Lucenti affirmatively waived any claims she may have had with respect to: (1) 1999–2000 allegations involving Pryor, Barksdale, Berger, and Jankowski; and (2) the April 2, 2001 incident involving Vega. "[T]he withdrawal of an EEO complaint must be considered as a waiver of any underlying discrimination claims." *Littlejohn v. Henderson,* No. 01 Civ. 2772(JG), 2003 WL 21738608, at *3 (E.D.N.Y. June 19, 2003). *See also Baber v. Runyon,* No. 97 Civ. 4798, 1998 WL 912065, at *5–*6 (S.D.N.Y. Dec.30, 1998) ("Although not yet addressed by the Second Circuit, courts considering whether a plaintiff who withdraws an administrative complaint has exhausted administrative remedies have concluded that the withdrawal constitutes a failure to exhaust administrative remedies.") (citing *Khader v. Aspin,* 1 F.3d 968, 971 (10th Cir.1993)); *Wrenn v. Sec'y, Dep't of Veterans Affairs,* 918 F.2d 1073, 1078 (2d Cir.1990) (agreeing with reasoning that "[a]llowing a plaintiff to abandon the administrative remedies he has initiated would tend to frustrate the

ability of the agency to deal with the complaints").

With respect to the 1999–2000 events, Lucenti explicitly withdrew her EEO complaint, stating: "Personal business, I drop the case." The form of withdrawal, signed by Lucenti, stated, "I fully understand that by withdrawing the complaint or allegation(s) I have withdrawn, I am waiving my rights to any further appeal of this allegation(s) through the EEO process. I further stipulate that my withdrawal did not result from threat, coercion, intimidation, promise or inducement." *Id.*

Similarly, with respect to her claim regarding the April 2, 2001 incident involving Vega and the June 21, 2001 notice of suspension, Lucenti on November 12, 2001 explicitly withdrew her EEO complaint regarding these matters. The withdrawal form stated:

I, Lisa Lucenti, do hereby voluntarily withdraw my EEO complaint in its entirety. I fully understand that by withdrawing the complaint I waive my rights to any further appeal through the EEO process. I further stipulate that my withdrawal did not result from any threat, coercion, intimidation, promise or inducement.

Accordingly, Lucenti affirmatively waived any claim arising from events alleged in either of these withdrawn complaints and thus cannot maintain any such claim in this lawsuit.

In her complaint and in deposition, Lucenti alleges additional acts by Kofi and other individuals that post-date the EEO complaint underlying this lawsuit. Specifically, she complains that Kofi issued her a letter of warning on October 10, 2002, and that other supervisors who succeeded Kofi, *i.e.*, Supervisors Wiggs, Murtha, Stensland, and Tripp, would watch her and/or criticize her work performance as too slow. These acts, however, were not brought before the EEO office for investigation or mediation or otherwise considered by the EEO office in its dismissal of her EEO complaint. Thus, Lucenti has failed to exhaust these claims as required. *See* 29 C.F.R. § 1614.105(a)(1) and 106(a) and (b).

Furthermore, these actions are not reasonably related to Lucenti's current complaints. Lucenti has specifically conceded that neither Wiggs, Stensland, nor Tripp were discriminating against her. Thus, no connection between these admittedly nondiscriminatory actions and those of Kofi, which Lucenti alleges to be discriminatory, has been established.

## A. *The Continuing Violations Doctrine Does Not Apply*

Lucenti contends that the continuing violations doctrine permits actions occurring prior to January 18, 2002 to form the basis for Government liability. The continuing-violation doctrine "extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the statute of limitations." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir.1998) (quoting *Annis v. County of Westchester*, 136 F.3d 239, 246 (2d Cir.1998)). The Second Circuit has repeatedly ruled that "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Quinn*, 159 F.3d at 765 (rejecting continuing violation claim despite allegations of more than 30 incidents of sexual harassment). It is also well-settled that simply "cit[ing] a number of instances in which [plaintiff] was allegedly discriminatorily treated" will not suffice to establish a continuing violation necessary to salvage untimely claims. *Ghosh v. New York Univ. Med. Ctr.*, 576 F.Supp.

86, 93 n. 24 (S.D.N.Y.1983). However, a continuing violation may be found "where there is proof of specific ongoing discriminatory polices or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994).

In support of her claim of continuous harassment, Lucenti has cited *Petrosino v. Bell Atlantic,* 385 F.3d 210 (2d Cir.2004). There, the plaintiff alleged that she was subjected to concerted and continuous sexually explicit and insulting comments and she had been denied promotion opportunities for years because of the hostile environment towards women. *Id.* at 214–15. In *Petrosino,* the plaintiff alleged that her third-level manager, who had been there during the entirety of her tenure at Bell Atlantic had (1) made gender-hostile comments and was the primary cause of her inability to obtain a promotion. *Id.* at 214, 217–18. Further, the plaintiff demonstrated that certain gender-hostile actions occurred during the limitations period. *Id.* at 220.

Lucenti's opposition indicates that the majority of her allegations regarding the nature of the pre–2002 conduct are allegations of sexually explicit harassment. *See, e.g.,* Pl. Aff. at ¶¶ 5 and 6 (Fox, supervising from 1990–93, "stated sexual words to me and began asking me sexual and private questions. That he would rub his body against me and he would tell me to go out with him."); *id.* at ¶¶ 12–13 (Rossi, supervising during 1995, commented in front of male co-workers that Lucenti had "nice legs," and reprimanded her for wearing white socks; co-workers harassed her in 1995 by posting "lewd and sexually explicit pictures with [her] name written on it" and asked her questions such as "what color

panties do you have on"); Pl. Dep. Tr. at 107:7–13 (Pryor stared at Lucenti in a "sexual" way).

In contrast, the alleged harassment by Kofi bears no similarity to those allegations. Indeed, given the sexually explicit nature of Lucenti's allegations regarding the conduct of Fox, Rossi, and her co-workers, she cannot assert that Kofi's alleged conduct shares the same nature as any pre–2002 alleged conduct that could reasonably be construed as discriminatory.

Lucenti has sought to create a connection between these discrete incidents by asserting that,

> Fox was instrumental in informing one supervisor and co-employee after another that he had been forced to leave Lenox Hill as a result of the accusations of sexual harassment by both the plaintiff and another female letter carrier. What followed was that supervisors intimidated, ridiculed, insulted and treated the plaintiff in a hostile manner.

Pl. Opp. at 6. Lucenti has asserted that Fox spoke to various of her supervisors about her, including Rossi and Pryor. However, with respect to Rossi and Pryor, the conversations they had with Fox took place after they had left Lenox Hill and ceased contact with Lucenti. *See* Fox Dept. Tr. at 54:18–25 (Fox spoke with Rossi after 1996); *id.* at 67:11–19 (Fox spoke with Pryor after 2002). Fox further testified that he never spoke with Kofi. *Id.* at 73:22–24. Thus, the evidence fails to show any causal connection between Fox and the alleged conduct of any succeeding supervisor, including Kofi.

Here, the nature of the conduct alleged by Lucenti in this case, the frequent turnover of Lucenti's supervisors and the substantial breaks of time between periods of alleged harassment, all demonstrate that no reasonable juror could conclude that Lucenti was subjected to one

ongoing discriminatory policy or mechanism from 1990 to 2002. Because Lucenti has merely alleged multiple incidents of discrimination and cannot point to any "discriminatory policy or mechanism," only the claims regarding events of March 18 and 19, 2002 are timely.

## III. *Employment Discrimination Has Not Been Established*

Title VII makes it unlawful "for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The Rehabilitation Act reads in relevant part: "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity ... conducted by ... the United States Postal Service." 29 U.S.C. § 794(a). Here, Lucenti has alleged that she was subjected to a hostile work environment because of her race, gender, and alleged disability; that she was retaliated against because of her prior EEO activity; and that the Government failed to reasonably accommodate her alleged disability.

To determine whether employers have violated the Rehabilitation Act, courts use the standards set forth in the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). 29 U.S.C. § 794(d); *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir.2000). Courts have routinely used Title VII as a model when interpreting the ADA, *see, e.g., Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir.2001) (retaliation claims); *Parker v. Sony Pictures Entertainment, Inc.*, 260 F.3d 100, 111 (2d Cir.

2001) (attorney's fees). Thus, Lucenti's hostile work environment and retaliation claims under Title VII and the Rehabilitation Act properly are addressed under the same standard.

Under the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the plaintiff bears the initial burden of establishing a *prima facie* case of employment discrimination. *Id.* at 802, 93 S.Ct. 1817. Once the plaintiff has established a *prima facie* case, the burden of production shifts to the defendant to rebut this presumption by articulating a legitimate, nondiscriminatory reason for its actions. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). To satisfy its burden, the defendant must produce admissible evidence sufficient to justify a judgment in its favor. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994). "Any stated reason is sufficient; the employer need not persuade the court that the proffered reason was the actual reason for its decision." *Tarshis v. Riese Org.*, 211 F.3d 30, 36 (2d Cir.2000). If the employer makes such a showing, the presumption of discrimination completely "drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). "It is important to note, however, that although the *McDonnell Douglas* presumption shifts the burden of production to the defendant," "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 507, 113 S.Ct. 2742 (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). Finally, the burden of production shifts back to the plaintiff to

show that the employer's reason was merely a pretext for discrimination. *See Chambers,* 43 F.3d at 38.

## A. *Lucenti Has Not Established a Prima Facie Case of a Hostile Work Environment*

 Title VII prohibits employers from, among other conduct, "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). A hostile work environment claim arises "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (citations and internal quotation marks omitted).

 Although Lucenti alleges that she was subjected to a hostile work environment based on race, gender, and disability, the undisputed evidence fails to demonstrate that her workplace was permeated with "discriminatory 'intimidation, ridicule, and insult … that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" *Howley v. Town of Stratford,* 217 F.3d 141, 153 (2d Cir. 2000) (quoting *Harris v. Forklift Systems,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).[1]

As the Second Circuit recently noted,

[e]veryone can be characterized by [their] sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

*Alfano v. Costello,* 294 F.3d 365, 375 (2d Cir.2002) (concluding that sex-neutral comments cannot, without other circumstantial evidence creating an inference of discrimination, support a hostile work environment claim based on sex). Furthermore, it is black letter law that Title VII does not establish a civility code for employment. *See, e.g., Curtis v. Airborne Freight Corp.,* 87 F.Supp.2d 234, 250–51 (S.D.N.Y.2000) (Title VII "does not reach so far as to protect plaintiffs from undiscriminating intimidation by bullish and abusive supervisors … [Plaintiff] must produce evidence that she was discriminated against because of her [membership in a protected class]."); *Richardson v. New York State Dept. of Correctional Servs.,* 180 F.3d 426, 440 (2d Cir.1999) (alleged discriminatory acts must relate to plaintiff's protected category in order to be actionable). *See also Munday v. Waste Mgmt. of N. Am.,* 126 F.3d 239 (4th Cir.1997), *cert. denied,* 522 U.S. 1116, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998) (yelling at plaintiff during meeting, directing employees to ignore her and refusing to communicate with her about employment-related complaints held to be insufficient to state a hostile environment claim); *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1298 (3d Cir.1997) (harsh verbal reprimands insufficient to state a claim).

In this case, there is no evidence of a "linkage or correlation," *Alfano,* 294 F.3d at 375, between the acts complained of and any claimed ground of discrimination. With respect to Kofi, whom Lucenti alleges retaliated against her for prior EEO activity and discriminated against her on the bases of race and disability, Lucenti

---

**1.** For purposes of this discussion, the Court assumes, *arguendo,* that Lucenti has a disability within the meaning of the Rehabilitation Act.

testified that, "I don't remember her, when she was there. All I remember her is coming up to me, and following me to the bathroom, telling me that I don't have enough mail. Taking me off my route and putting me on different routes." Lucenti Dep. Tr. at 116:20–24. Lucenti further complained that Kofi gave her a "write up" at the end of the day rather than at the beginning of the day. Lucenti complained that Kofi criticized her for sitting on her route (that is, work station), for using a cell phone and for taking "too many long breaks." *Id.* at 116:18–124:2.

However, there is no allegation that any actions or statements made by Kofi on March 18 and 19, 2002 were related to Lucenti's race or disability. Lucenti conceded that Kofi never made any comments about her race or any alleged disability. Lucenti Dep. Tr. at 287:13–23. Lucenti's basis for believing that Kofi was discriminating against her on the basis of her alleged disability was simply that Kofi purportedly knew about her "medical condition." *Id.* at 287:22–288:11. Other than Lucenti's unsubstantiated speculation that the conduct was animated by her race and/or disability, there is no allegation of any specific instance of conduct that reveals or even suggests animus based upon either protected ground. To the contrary, all evidence—including Lucenti's admission that she was working poorly, *see* Lucenti Dep. Tr. at 65:20–23; 110:15–111:5—indicates that Kofi's action were animated by Lucenti's failure to perform her job adequately and because the volume on Route 49 did not warrant Lucenti working eight hours per day on that route. Indeed, it is undisputed that on April 21, 2001, the NALC and management agreed that Lucenti's position as a day router on Route 49 was "established as no more than a 4 hour assignment if volume warrants, along with other carrier duties to be assigned by management."

Lucenti has submitted affidavits from four co-workers, Ernest Twomley, Anthony Ciccone, Karl Middleton, and William Foley. While these four affiants conclusorily stated that Lucenti was treated "differently" from other workers, they fail to establish that she was singled out on any proscribed ground, be it race, gender, disability, or because of prior EEO activity. None of these affiants ascribe any impermissible—*i.e.,* discriminatory—motives to Kofi, nor do they provide any evidence regarding such motives. These affidavits do not establish Lucenti's discrimination claim.

Lucenti has contended that the November 4, 2001 arbitration decision shows that she was subjected to a hostile work environment. That decision, however, addressed Lucenti's grievance brought in the context of union proceedings and did not purport to resolve questions of whether management discriminated against Lucenti on a proscribed ground or whether a hostile work environment actionable under a federal discrimination statute existed. The arbitrator found that Pryor's actions were undertaken in an attempt "to advance supervisory objectives," Arb. Dec. at 19, and that "much of the evidence of 'harassment' suggests a continuing effort to improve Lucenti's performance with Lucenti resisting passively and actively," *id.* at 17.

■ Allegations of even constant reprimands and work criticism by themselves are not sufficient to establish a hostile environment claim. *See, e.g., Nwanji v. City of New York,* 98 Civ. 4263(RLE), 2000 WL 1341448 at *3, *5 (S.D.N.Y. Sept. 15, 2000) ("While [plaintiff] did present ample evidence that his supervisors were constantly reprimanding him and documenting his poor work performance, this evidence, absent a showing of discriminatory

animus, does not support a hostile work environment claim.") Because Lucenti has failed to proffer any evidence reflecting animus on the part of Kofi towards her based on her race, gender, or disability, Lucenti's single timely claim of hostile work environment fails as a matter of law. *See Alfano,* 294 F.3d at 375.

Even if it is assumed that Lucenti could support an inference of animus based on disability, race, or gender, no reasonable jury could find that the alleged conduct was objectively severe enough to constitute a hostile work environment. *See Richardson,* 180 F.3d at 436. Lucenti has not alleged that Kofi ever used profanity, derogatory epithets, or any other comparably charged language, or made rude or offensive comments about Lucenti's race, gender, or alleged disability. Assuming, *arguendo,* the truth of Lucenti's allegations regarding Kofi's reprimands regarding Lucenti's work, "sitting on the route," following her to the bathroom on one occasion, these actions did not materially alter Lucenti's working conditions. *See Rivera v. Apple Indus. Corp.,* 148 F.Supp.2d 202 (E.D.N.Y.2001) (alleged harassment by supervisors, which consisted of them constantly calling him "Cyclops" and "Freddy Kruger," and commenting on whether he had trouble having an erection and asking him whether he was homosexual, was not sufficiently severe or pervasive to constitute a hostile work environment); *Robinson,* 120 F.3d at 1298 (harsh verbal reprimands insufficient to state a claim); *Munday,* 126 F.3d at 239 (yelling at plaintiff during meeting, directing employees to ignore her and refusing to communicate with her about employment-related complaints held to be in-

sufficient to state a hostile environment claim). *See also Curtis,* 87 F.Supp.2d 234 (S.D.N.Y.2000) at 250–51 (Title VII does not protect plaintiffs from undiscriminating intimidation "by bullish and abusive supervisors").

**B.** ***Lucenti Has Not Established a Prima Facie Case of Retaliation***

■ Lucenti has asserted that Kofi's alleged actions were undertaken in retaliation for Lucenti's prior EEO activity.[2] *See* Lucenti Dep. Tr. at 131:18–132:9. Title VII prohibits an employer from discriminating against an employee who takes action in opposition to an unlawful employment practice. *See* 42 U.S.C. § 2000e–3(a). In order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must show:

> (1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that she suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action.

*Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 79 (2d Cir.2001) (internal citation omitted).

■ Lucenti cannot prevail on a retaliation claim with respect to Kofi's alleged actions on March 18 and 19, 2002 because there is no showing that Kofi's alleged conduct constituted an adverse employment action. Courts in this district have found that to qualify as an adverse employment action, employer conduct must subject plaintiff to a " '[m]aterially adverse change in the terms or conditions of [her] employment[.]' " *Medwid v. Baker,* 752

---

**2.** Lucenti also has alleged that Fox, Agostini, Mazzio and Rossi retaliated against her. Lucenti Dep. Tr. at 131:23–132:4. However, any claim Lucenti may have had as a result of any such retaliation has not been exhausted and has long since been extinguished under the limitation period applicable in this case.

F.Supp. 125, 136 (S.D.N.Y.1990). Reprimands, threats of disciplinary action, and excessive scrutiny do not constitute adverse employment actions. *See, e.g., Stembridge v. City of New York,* 88 F.Supp.2d 276 (S.D.N.Y.2000) (no actionable harm where "reprimand contained a warning that repetition of improper behavior could result in disciplinary action but contained no indication of any planned discipline or further action"); *Nicastro v. Runyon,* 60 F.Supp.2d 181, 186 (S.D.N.Y.1999) (excessive scrutiny from supervisors and requiring documentation for sick leave could not support a Title VII retaliation claim); *Castro v. New York City Bd. of Educ. Personnel,* No. 96 Civ. 6314(MBM), 1998 WL 108004, *7 (S.D.N.Y. Mar.12, 1998) ("[A]lthough reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions."); *Henriquez v. Times Herald Record,* No. 97 Civ. 6176(SHS), 1997 WL 73244, *6 (S.D.N.Y. Nov. 25, 1997), *aff'd,* 165 F.3d 14 (2d Cir. 1998) (unfair criticism of plaintiff's performance was not the type of employment action that courts have found to be materially adverse). The alleged reprimands and close scrutiny at issue here likewise do not rise to the level of adverse employment action.

Second, Lucenti has not established a causal connection between her prior EEO activity and Kofi's alleged conduct. Lucenti never testified as to any comment by Kofi regarding Plaintiff's EEO claims. Indeed, as discussed above, the record indicates that Kofi's actions were motivated by a concern over Lucenti's job performance. In sum, Lucenti has not presented evidence sufficient for a jury reasonably to find that Kofi's actions on March 18 and 19, 2002 constituted retaliation in violation of Title VII.

### C. *Lucenti Has Failed to Establish a Reasonable Accommodations Claim*

■ Lucenti has contended that the Postal Service failed to make reasonable accommodations for her alleged disability of anxiety disorder. In order to establish a *prima facie* case under the Rehabilitation Act, Lucenti must show that (1) she is an individual with a disability within the meaning of the statute; (2) the Postal Service had notice of her disability; (3) she was otherwise qualified to meet the program requirements; and (4) the Postal Service refused to make reasonable accommodations. *See Stone v. City of Mount Vernon,* 118 F.3d 92, 96–97 (2d Cir.1997).

The term "individual with a disability" is defined for the purposes of the Rehabilitation Act as any person who "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B). The Second Circuit utilizes a two-prong inquiry to determine whether one is disabled under the Act. *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 722 (2d Cir.1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995). First, the Court must determine whether the plaintiff has a physical or mental impairment. *Id.* Second, the Court must analyze whether the impairment substantially limits one or more of that person's major life activities. *Id.*

According to the regulations promulgated under the Act, "major life activities" include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii); *see also* 28 C.F.R.

§ 41.31(b)(2).[3]

■ Assuming, *arguendo*, that Lucenti can establish that she has an "impairment" for purposes of the Rehabilitation Act, there is no evidence that she is substantially limited in performing any major life activity. Indeed, Lucenti's own testimony demonstrates that she is capable of walking and jogging. *See* Lucenti Dep. Tr. at 375:15–25. Further, Lucenti's psychiatrist, Dr. Zedek, testified that she was able to take care of herself, walk, jog, work, wash, and feed herself. *See* Zedek Dep. Tr. at 1676:19–167:4. Although Dr. Zedek testified that Lucenti was from time to time (approximately eight to ten times per year) anxious and unable to enjoy sex, watch television, read, jog, or attend work, he testified that these periods were transient and shortlived. Zedek Dep. Tr. at 167:5–16, 169:10–21.

Additionally, Lucenti has not established that the Postal Service failed to make reasonable accommodations. Under the Rehabilitation Act, an employer must make a "reasonable accommodation" for a disabled employee, unless the accommodation would impose an "undue hardship" on the employer:

> "Reasonable accommodation" means the changes and modifications which can be made in the structure of a job or employment and training program, or in the manner in which a job is performed or an employment and training program is conducted, unless it would impose an undue hardship on the operation of the

recipient's program. Reasonable accommodation may include: ... Job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, the provision of readers or interpreters, and other similar actions.

29 C.F.R. § 32.3; *see also* 29 C.F.R. § 1630.2(*o*) (similar definition under ADA).[4]

■ While an employer must "make a reasonable accommodation" of an employee's disability, the Rehabilitation Act does not require an employer either to "make 'fundamental' or 'substantial' modifications" in order to eliminate the disadvantages of a disability or to "provide every accommodation the disabled employee may request." *Fink v. New York City Dep't of Pers.*, 53 F.3d 565, 567 (2d Cir.1995) (citing *Alexander v. Choate*, 469 U.S. 287, 300, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) and *Carter v. Bennett*, 840 F.2d 63, 67 (D.C.Cir. 1988)). *See, e.g., Hardy v. Village of Piermont*, 923 F.Supp. 604, 610 (S.D.N.Y.1996) (police department need not create new " 'light duty' position that does not require walking or running"); *Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 123 (2d Cir.1999) (employer not required to cease all contact between employee and supervisor); *Fink*, 53 F.3d at 567–68 (after providing "visually disabled candidates" with tape-recording devices, readers, a private room and extra time for examination, city not required to supply readers who "perform their assigned role to perfection" and without "disruptive chatter").

---

**3.** The definition of an "individual with a disability" in the ADA is virtually identical to the definition of "individual with a handicap" under the Rehabilitation Act. 29 C.F.R. Pt. 1630, App., 56 Fed.Reg. 35726, 35740 (July 26, 1991); *see Chandler v. City of Dallas*, 2 F.3d 1385, 1391 (5th Cir.1993). "Congress intended that the relevant case law developed under the Rehabilitation Act should be gener-

ally applicable to the term 'disability' as used in the ADA." 29 C.F.R. Pt. 1630, App.—Interpretive Guidance on Title I of the Americans with Disabilities Act, citing S.Rep. No. 116, 101st Cong., 1st Sess. 21 (1989).

**4.** An "undue hardship" is defined at 29 C.F.R. § 32.13. *See also* 29 C.F.R. § 1630.2(p) (similar definition under ADA).

In this case, Lucenti has not established that the Postal Service refused to make reasonable accommodation. Her requested accommodation was not to work beyond eight hours. While management attempted to persuade Lucenti to work a full eight hours, management did not require her to work overtime. Lucenti's overtime records show that after Dr. Zedek's notes were provided, she worked a total of approximately eleven hours of overtime over the course of two months until March 23, 2000, at which point Lucenti was absent from work for seven months. Further, Lucenti's payroll records demonstrate that she voluntarily worked 144.82 hours of overtime in 1998 and 115.96 hours of overtime in 1999. Furthermore, Lucenti has admitted that after she returned to work in October 2000, with one exception, she did not work any overtime. Lucenti Dep. Tr. at 281:7–11. Under these facts and circumstances, no reasonable trier of fact could find that the Postal Service did not reasonably accommodate Lucenti's request for accommodation.

## IV. *The Claim For Intentional Infliction Of Emotional Distress Lacks Subject Matter Jurisdiction*

Lucenti's claim for intentional infliction of emotional distress must be dismissed for lack of subject matter jurisdiction. Title VII and the Rehabilitation Act are the exclusive remedies available to federal employees who allege employment discrimination. *See, e.g., Brown,* 425 U.S. at 832, 96 S.Ct. 1961; *Briones,* 101 F.3d at 289. Title VII was intended as the "exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." *Brown,* 425 U.S. at 829, 96 S.Ct. 1961. *See also Di-Pompo v. West Point Military Acad.,* 708 F.Supp. 540, 544 (S.D.N.Y.1989) (§ 501 of the Rehabilitation Act is sole remedy for federal employees alleging disability discrimination). Thus, federal employees possess no private cause of action outside of Title VII and the Rehabilitation Act for employment discrimination. *See, e.g., Serrano v. Runyon,* No. 3:95–469, 1997 WL 718976 at *5 (D.Conn. Aug.22, 1997) (dismissing plaintiff's state law claim alleging sexual discrimination and common law claim of intentional infliction of emotional distress on the grounds that "as an employee of the United States Postal Service, [the plaintiff's] exclusive remedy [for federal employment discrimination] lies in Title VII."). Because Lucenti's state law claim is duplicative of her claims under Title VII and the Rehabilitation Act, the state law claim is barred and is dismissed.

## *Conclusion*

For the reasons set forth above, the Government's motion is granted and the complaint is dismissed.

It is so ordered.